Jones, Chief Judge,
delivered the opinion of the court:
Plaintiff, on December 12, 1942, contracted with the defendant to manufacture and deliver 60,000 jackets and 100,000 pairs of trousers. The jackets were to be delivered by April 26, 1948, and the trousers by May 21, 1943. The cloth was to be furnished by the Government. The stipulated price of the jackets was $0,575 each.
At the time of the awarding of the contract plaintiff was engaged in the performance of several other contracts with the Government. It began its first cutting of material in connection with the instant contract on January 9, 1943.
Plaintiff experienced difficulty in training employees for certain operations and there was delay also in securing button-attaching machines and cartons for packing.
Finding that he would not be able to deliver the entire quantity of jackets within the time specified, the plaintiff requested defendant to terminate the contract as to 25,000 jackets. On March 17, 1943, the defendant complied with plaintiff’s request and advised plaintiff that it would contract elsewhere for the terminated portion under Article 26 of the contract which provided for liquidated damages for delay in delivery, and for charging excess cost on relet portions of a terminated contract.
This provision and its substitute limiting liquidated damages are set out in finding 11.
On March 17,1943, defendant contracted with the Puritan Knitting Mills Company of Altoona, Pennsylvania, for the 25,000 jackets at $0,649 each, for delivery by April 26, 1943.
The Bidder’s Reference Book, incorporated in the contract, *717 provided in part that contractor should carefully match the material so that the shading would be uniform. It also provided for 100 percent inspection of the first shipment, but if upon inspection of not less than 10 percent of any subsequent shipment, an unreasonable percentage of the supplies did not meet specifications the entire remaining part of the shipment might be rejected without further inspection.
Under this provision the defendant rejected a large number of packaged jackets. Plaintiff renumbered and reshipped many of the rejected packages, and they were again rejected by the defendant without further inspection. The extent of acceptance and rejection is set out in finding 13, showing that only about one-third of those that were shipped were accepted for delivery under the contract.
Plaintiff completed manufacturing operations under the contract June 12,1943. Thereafter plaintiff’s facilities were engaged in repairing jackets that had been rejected by defendant.
On October 22,1943, defendant terminated plaintiff’s right to deliver 7,210 jackets under Article 26 of the contract and on the same day contracted with Brill Uniforms, Inc., of Milwaukee, Wisconsin, to manufacture that number. The contract price was $0,825 each, which was unreasonably high. Although it was defendant’s practice in reletting terminated portions of contracts to solicit bids from two or more contractors, the purchase order was placed with Brill without prior solicitation or inquiry among other manufacturers. The trial commissioner who heard the testimony found that a reasonable price would have been $0,745 per garment, and we adopt that finding.
After some correspondence the parties entered into a supplementary agreement called “Modification E,” by the terms of which defendant agreed to accept, at a reduced price, the garments that did not meet specifications. Plaintiff was paid for those garments on the reduced basis stipulated in the agreement pertaining to the rejected garments.
As to the trousers, there was a separate contract. It also called for garments of a uniform shade. It further specified the sizes and the yardage of government material to be allowed per garment. The trousers were to be delivered accord *718 ing to a schedule which called for deliveries beginning January 21 and ending May 21, 1943.
The Bidder’s Eeference Book was also incorporated by reference into this contract and due to what was regarded as an unreasonably high percentage of defective trousers that had been found upon inspection after delivery, defendant rejected a large number of packaged trousers without inspection. These were renumbered, reshipped and again rejected, the numbers being set out in the table in finding 25. The table includes duplicated shipments.
Actually plaintiff manufactured 83,500 trousers, 18,374 of which were rejected as defective. These were retained by defendant and placed in the category of “irreparables.”
The contract allowed 293,851.39 yards of material for the 100,000 trousers, but defendant stopped furnishing cloth after May 29, 1943. Up to that time it had furnished 257,897.75 yards of cloth. Plaintiff’s manufacturing operations stopped for lack of cloth on June 26, 1943. Thereafter plaintiff’s facilities were engaged in repairing trousers which had been previously rejected.
On October 23,1943, defendant terminated plaintiff’s right to deliver 35,468 pairs of trousers. On the same day it contracted by purchase order with the Blue Buckle Overall Company of Lynchburg, Virginia, for 25,000 pairs of trousers at $0.57 each, and with Brown Garment Manufacturing Company, Little Eock, Arkansas, for 10,468 trousers, at $0.61 each.
Defendant did not act with reasonable promptness. It could well have acted soon after May 29,1943, when it stopped furnishing cloth to plaintiff, since it evidently had determined at that time to allow no more trousers to be manufactured by plaintiff under the contract.
Blue Buckle had offered and was able to make the entire number at $0.57. The record discloses no reason why the lower offer should not have been accepted, and plaintiff should not have been charged the excess cost over the figure Blue Buckle offered.
Early in 1945 defendant and plaintiff entered into a supplemental agreement entitled “Modification F” by the terms of which defendant accepted the 18,374 pairs of trousers at a *719 price below that which was provided in the original contract and plaintiff was paid on the reduced basis.
The cloth was spread from the bolt upon tables, doubled and redoubled until there were a number of plies and the pattern on a number of plies was thus cut at one time. Component parts cut from each double layer of cloth were required to be marked with a distinctive number so that all the constituent parts of a garment could be identified with the same piece of material. This was called “shade-marking” and was required in order to secure as far as possible a uniform shade of cloth in the completed garment. In the beginning plaintiff used what is known as the Bates system which marked a number in indelible or black ink directly on the edge of the material but which, when the parts were sewn together, was not visible. Later plaintiff used what is known as a Soabar machine which automatically prints the ply number, cut number, size and bundle number on a roll of tickets and fastens an appropriate ticket to each part. Plaintiff had no Soabar machine at the commencement of the contract. He applied to purchase one, but was not given a preference rating. He later rented such a machine, but the record does not show just when the different methods of marking were used.
In its inspection defendant found that many garments were imperfect because of missing bartacks, open seams, drill holes, skipped stitches, raw edges, missing and misplaced buttons, defective pockets, dissimilar pockets and missing labels. In addition a number of garments were found upon inspection to be shaded and were rejected for that reason. Defendant, however, accepted shaded garments if shade-markings on the component parts indicated that they had been cut from the same piece of material.
As of April 20,1943, more of plaintiff’s shipments had been rejected than had been accepted. The details are set out in finding 35. In May 1943 plaintiff discovered that a quantity of cloth which at that time was on the table ready for cutting was not of uniform shade. He brought the matter to the attention of the contracting officer, who was furnished with samples of the doth.
There was considerable controversy over how much the difference in shade in some of the garments was due to the *720 difference in the shade of the particular bolt of cloth, but the evidence does not disclose just what portion of the mismatched shading was due to the variation in the bolt. The evidence shows that there was some splicing of cloth, some carelessness in shade-marking, and mishandling of shade-marked cut component parts and also inadequate supervisory inspection.
In procuring jackets from Puritan and Brill by relet purchase order $576.80 paid to Brill was in excess of the reasonable market price and should not have been charged to plaintiff.
If, in reletting the terminated portion of the trousers contract, the entire contract had been let to Blue Buckle, which was ready, willing and able to produce the entire quantity, the extra cost chargeable to plaintiff would have been reduced by $444.84.
Plaintiff earnestly claims that it is entitled to receive a remission of liquidated damages on account of the delivery and acceptance of the “irreparables” and that because of the ultimate acceptance of the “irreparables” the delivery should be dated back to the dates when they were reshipped as “ir-reparables,” and claims that he should recover the sum of $1,892.26. This refund cannot be allowed. We think that the acceptance of the so-called “irreparables” was in the nature of a compromise settlement as entered into by supplemental agreement and did not relieve plaintiff of his obligation to deliver acceptable garments within the time specified in the contract. The defendant assessed no liquidated damages for any period after August 21, 1948. The cancelling of and reletting of portions of the contract probably made the liquidated damages less than would have obtained had there been no cancellation of the original obligation. Mao-Laren Sportswear Go. v. United, States, 121C. Cls. 396. However, if defendant had relet the terminated portion of the contract as of June 5, 1943, we find that 23,976 completed trousers under the relet contract would have been made sufficiently prior to August 19, 1943, as would have resulted in liquidated damages of $601.40 less than the amount that was actually withheld from plaintiff under the terminated portion of the contract.
*721 Plaintiff is entitled to recover the sum of $1,622.54.
It is so ordered.
Laramore, Judge; MaddeN, Judge; Whitaker, Judge; and LittletoN, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes the following findings of fact:
1. Plaintiff, trading individually with his principal place of business in Philadelphia, was awarded a bid by the Quartermaster Corps, United States Army, to manufacture and deliver herringbone twill jackets and trousers, and thereafter entered into the following two contracts with defendant:

2. Each contract and the specifications thereto provided in virtually identical language:
Article 4. Inspection. — (a) All material and workmanship shall be subject to inspection and test at all times and places and, when practicable, during manufacture. In case any articles are found to be defective in material or workmanship, or otherwise not in conformity with the specification requirements, the Government shall have the right to reject such articles, or require their correction. Kejected articles, and/or articles requiring correction, shall be removed by and at the expense of the Contractor promptly after notice so to do. If the Contractor fails to promptly remove such articles and to proceed promptly with the replacement and/or correction thereof, the Government may, by contract or otherwise, replace and/or correct such articles and charge to the Contractor the excess cost occasioned the Government thereby, or the Government may terminate the right of the Contractor to proceed as provided in Article 5 (or in the Article entitled “Delays-Liquidated Damages” if it *722 is substituted for Article 5) of this contract, the Contractor and surety being liable for any damage to the same extent as provided in said Article 5 (or in said substitute article) for terminations thereunder.
(b) If inspection and test, whether preliminary or final, is made on the premises of the Contractor or subcontractor, the Contractor shall furnish, without additional charge, all reasonable facilities and assistance for the safe and convenient inspections and tests required by the inspectors in the performance of their duty. All inspections and tests by the Government shall be performed in such a manner as not to unduly delay the work. Special and performance tests shall be as described in the specifications. The Government reserves the right to charge to the Contractor any additional cost of inspection and test when articles are not ready at the time inspection is requested by the Contractor.
(c) Final inspection and acceptance of materials and finished articles will be made after delivery, unless otherwise stated. If final inspection is made at a point other than the premises of the Contractor or a subcontractor, it shall be at the expense of the Government except for the value of samples used in case of rejection. Final inspection shall be conclusive except as regards latent defects, fraud, or such gross mistakes as amount to fraud. Final inspection and acceptance or rejection of the materials or supplies shall be made as promptly as practicable, but failure to inspect and accept or reject materials or supplies shall not impose liability on the Government for such materials or supplies as are not in accordance with the specifications. In the event public necessity requires the use of materials or supplies not conforming to the specifications, payment therefor shall be made at a proper reduction in price.
Specifications (including those incorporated by reference from the Bidder’s Reference Book) :
C — 1. Material — Unless otherwise specified in the invitation for bids, the following materials or suitable substitutes as authorized shall be used in the manufacture of these [garments] and shall be furnished by the United States Government.
* * * * #
Cloth, cotton, herringbone twill, 8.5 ozs., olive drab. * * * * *
C-9. Material to be Furnished by the Government— (a) The Government shall deliver to the contractor, as *723 indicated in the Request for Informal Bids, for use in the manufacture of the supplies to be furnished under the terms of this contract the material specified therein. * * *
G-10. Allowances of Materials to be Fv/rnished by the Government — (a) The unit allowances of materials for the articles required are set forth in the Request for Informal Bids. Yardage of cloth furnished contractors is gross with no deductions for imperfections. Splicing of cloth in lays on account of material imperfections is prohibited. Cut parts having material imperfections which would result in unacceptable finished articles shall be replaced after cutting with parts from the same piece of cloth or from cloth of the same shade. * * *
‡ ‡ $
C-12. Schedule of Availability of Government Materials — The Government agrees to deliver materials f. o. b. place of manufacture as provided for in the Request for Informal Bids according to the schedule indicated therein. The percentages given in the table are the maximum which the Government will guarantee to deliver to contractors. No contractor will be required to draw amounts of cloth in excess of his requirements. The percentages given are cumulative. If cloth becomes available in greater quantities than stated in the Request for Informal Bids, same will be issued upon request of the individual contractor.
JACKET CONTRACT-W 669-QM-23946
3. Specifications P. Q. D. No. 45B, governing the jacket contract, provided in part:
1. * * * All component parts of the garment shall be cut out of one shade of material except the under-collar which may be cut out of ends.
2. * * * All component parts of the jacket shall be marked to insure a uniform shade throughout the garment, except those cut from ends as indicated in operation No. 1.
4. Bidder’s Reference Book (as amended by the Request for Informal Bids,) incorporated into the jacket contract by refei’ence, provided in part:
C-14. * * * (a) The Contractor will be required to carefully match the material in any single article, so that the shade will be uniform throughout.
*724 B-4. Final inspection and acceptance will be made at destination. The first shipment tendered will normally be given 100% inspection. If upon inspection of a reasonable portion (usually not less than 10%) of a subsequent shipment, an unreasonable percentage of non specification supplies is found therein, the entire remaining uninspected part shall be subject to rejection without further inspection and return to the contractor at his expense.
5. a. Defendant’s initial delivery of 10% (actual or constructive) of total cloth requirements under the jacket contract was made December 12, 1942. Subsequent deliveries were required by contract as follows:
Cumulative percent of total requirements:

Percent Date

30-December 27, 1942
50_January 31, 1943
70_January 26, 1943
90-February 10, 1943
100_February 25, 1943
There is no evidence or dispute that these requirements were not met by defendant.
b. The contract provided as to delivery of government-furnished material:
Following notice of the availability of Government Materials, such materials if furnished by a Quartermaster Depot or installation in the same city as the point of manufacture will be delivered to contractor at said Quartermaster Depot or installation not more than once in any seven day period except on written authority of the Contracting Officer, provided that in any event the contractor shall have given at least 72 hours notice of a desire to secure same. Where a contractor has requested the release of a quantity of such materials, has given the prescribed notice, and has received notice of the availability of such material, the contractor must accept delivery thereof at the time specified. Contractors failing to do so will be required to reimburse the Government for any expense resulting from such failure.
Notices to plaintiff of availability of materials, and notices by plaintiff of desire to secure material, are not in evidence.
6. The contract specified the various sizes required in the first 15,000 jackets, the quantities in each size, and the yard *725 age of government-furnished material to be allowed per garment in each size.
7. The Schedule of Deliveries in the contract required finished jackets to be delivered by plaintiff as follows:
3,000 by January 26, 1943
12,000 by February 25,1943
22,800 by March 27,1943
. 22,200 by April 26,1943
60,000 Total
8. At the time when the jacket contract was awarded, plaintiff was engaged in the performance of several other government contracts which had not yet been completed.
9. Although the first actual or constructive delivery of cloth to plaintiff was made by defendant on December 12,
1942, plaintiff began its first cutting of government-furnished material under the jacket contract on January 9,
1943. During the ensuing period of contract performance plaintiff experienced considerable trouble in training employees for certain examining operations, and delay in securing button-attaching machines and cartons for the packaging and shipment of finished garments.
10. a. Finding that he would not be able to deliver the entire quantity of jackets by April 26, 1943, as required by contract, plaintiff requested defendant in writing on March 15,1943, to terminate the contract as to 25,000 jackets. On March 17, 1943, defendant complied with plaintiff’s request by terminating plaintiff’s right to deliver 25,000 jackets and advised plaintiff that it would contract elsewhere for the terminated quantity pursuant to Article 26 of the contract.
b. As of March 17, 1943, plaintiff was delinquent in the delivery of 15,000 jackets.
11. a. Article 26 of the jacket contract provided:
Delays — Liquidated Damages. — If contractor refuses or fails to make delivery of acceptable material or supplies within the time or times specified in Article 1, or any extension or extensions thereof, the actual damage to the Government for the delay will be impossible to determine, and in lieu thereof the contractor shall pay to the Government, as fixed, agreed and liquidated/ damages for each calendar day of delay in the delivery of any article, a sum equal to one-fifth of one percentum (% of *726 1%) of the price of such article for each day’s delay after the time specified for delivery, and the contractor and his sureties shall be liable for the amount thereof: Provided, however, That if the contractor fails to make delivery of any portion of the material or supplies within the time specified in Article 1, the Government reserves the right to terminate the right of the contractor to deliver all or any portion of the undelivered material or supplies, and to purchase similar material or supplies in the open market or secure the manufacture and delivery thereof by contract or otherwise, charging against the contractor and his sureties any excess cost occasioned the Government thereby, together with liquidated damages accruing until such time as the Government may reasonably procure similar material or supplies elsewhere: Provided further, That the contractor shall not be charged with liquidated damages or any excess cost when the delay in delivery is due to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God or the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and delays of a subcontractor due to such causes unless the contracting officer shall determine that the materials or supplies to be furnished under the subcontract are procurable in the open market, if the contractor shall notify the contracting officer in writing of the cause of any such delay, within ten days from the beginning thereof, or within such further period as the contracting officer shall, with the approval of the Secretary of War or his duly authorized representative, prior to the date of final settlement of the contract, grant for the giving of such notice. The contracting officer shall then ascertain the facts and extent of the delay and extend the time for making delivery when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within thirty days, by the contractor to the Secretary of War or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for making delivery shall be final and conclusive on the parties hereto.
b. By supplemental agreement executed August 21, 1943, the parties deleted Article 26 entitled “Delays — Liquidated Damages” from the jacket contract and substituted therefor the following, effective August 21,1943:
*727 Belays — Damages (a) If the Contractor refuses or fails to make deliveries of the supplies within the time specified in Article 1 or any extension thereof, the Government, subject to the provisions of paragraph (b) herein, may, by a notice in writing from the Contracting Officer to the Contractor of its intention to terminate under this Article, terminate the right of the Contractor to deliver ajl or any portion of the undelivered material or supplies. In such event, the Government may (1) require the Contractor to deliver to the Government-such completed supplies, partially completed supplies and materials, parts, plans, drawings, information, and contract rights of the Contractor (hereinafter called manufacturing material), as the Contractor has produced or acquired for the performance of such portion of this contract as to which the right to proceed with delivery is terminated, and accomplish or secure the completion or manufacture of supplies therewith; and, in addition thereto or in lieu thereof (2) purchase in the open market or secure by contract or otherwise, the manufacture and delivery of supplies similar to those called for by this contract in an amount which together with the supplies, if any, completed under (1) above shall not exceed the amount of supplies the right to proceed with the delivery of which is terminated. If delivery is made pursuant to clause (1) of the preceding sentence the Government shall pay to the Contractor, less any previous payments, the following: a. For each unit of the completed supplies accepted by the Government the unit contract price, and b. for all partially completed supplies and manufacturing materials delivered, the unit contract price for each unit of supplies completed or manufactured therewith, less the cost to the Government of completion or manufacture, but if that cost exceeds the unit contract price, the Contractor and his sureties shall be liable for such excess. If the cost to the Government of supplies procured in accordance with clause (2) above exceeds the corresponding unit price or prices under this contract, the Contractor and his sureties shall be liable for such excess.
(b) The Government shall have a right of termination under this Article, but the Contractor shall not be charged with any excess cost or damages resulting from termination if (i) the delay of the Contractor in making deliveries is an excusable delay, as hereinafter defined, and (ii) the Contractor notifies the Contracting Officer in writing of such delay and the cause thereof, within ten days from the beginning thereof or within such further *728 period as the Contracting Officer shall, with the approval of the Secretary of War or his duly authorized representative, prior to the date of final settlement of the contract, grant for the giving of such notice. Upon receipt of such notification from the Contractor, the Contracting Officer shall ascertain the cause of the delay, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject to appeal within thirty days by the Contractor to the Secretary of War or his duly authorized representative, whose decision on such appeal as to the cause of delay shall be final and conclusive on the parties hereto. The term “excusable delay” as used in this paragraph means any delay in making deliveries which results without fault or negligence on the part of the Contractor and which is due to unforeseeable causes beyond his control including, without being limited to, acts of God or of the public enemy, any preference, priority or allocation order issued by the Government or any other act of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; and, unless the Contracting Officer shall determine that the materials or supplies to be furnished under a subcontract are procurable in the open market, any delay of a subcontractor which results without fault or negligence on the part of the Contractor, and which is due to unforeseeable causes beyond the control of the Contractor, including without being limited to the types of causes above enumerated.
(c) The Government reserves the right to charge Contractor damages resulting from delays in making deliveries, including field inspection costs incurred after the final delivery date of the contract, provided that the Contractor shall not be charged with any such damages or field inspection costs if the delay in making deliveries is an excusable delay, as defined in paragraph (b) above and the Contractor notifies the Contracting Officer as provided in said paragraph (b).
12. On March 17,1943, defendant contracted with the Puritan Knitting Mills Company of Altoona, Pennsylvania (hereinafter “Puritan”), for the 25,000 jackets at $0.649 each (a reasonable price), for delivery by April 26, 1943, under the same arrangements as to government-furnished material. Defendant acted with reasonable promptness in reletting to Puritan. The record of shipments accepted by defendant from Puritan is as follows:

*729
Jaoleets

April 6, 1943-1,835
April 6, 1943_. 1,564
April 7, 1943-2,859
April 8, 1943— 2,747
April 10, 1943. 4,561
April 12, 1943. 228
April 12, 1943. 2,079
April 14, 1943. 6,036
April 16, 1943. 3,050
June 1, 1943-41
Total_ 25,000
13. a. Pursuant to Section B-4 of the Bidder’s Reference Book (finding 4, supra), incorporated into the contract by-reference, due to the unreasonably high percentage of defective jackets that had been found upon inspection after delivery, defendant rejected without inspection a large number of packaged jackets delivered by plaintiff. Plaintiff renumbered and reshipped to defendant many of these unin-spected packages and they were again rejected by defendant without further inspection. The extent of this practice of reshipment and rejection without further inspection, as well as the record of finished jackets delivered by plaintiff and accepted by defendant, is shown in the following table:

b. Plaintiff had material for, and actually cut therefrom, 36,180 jackets. Plaintiff made its final cut of material under the jacket contract on May 15,1943 and all plaintiff’s manufacturing operations under this contract were completed by *730 June 12,1943. Thereafter plaintiff’s facilities were engaged in repairing jackets which had previously been rejected by defendant for shaded parts. Plaintiff’s final shipment and acceptance of jackets was on October 20,1943.
14. Due to plaintiff’s failure to meet delivery requirements, on October 22,1943 defendant terminated plaintiff’s right to deliver 7,210 jackets pursuant to contract Article 26 (finding 11, supra) and, on the same day, contracted for the same with Brill Uniforms, Inc., Milwaukee, Wisconsin, at the unreasonable price of $0,825 each, f. o. b. Milwaukee, for delivery by December 31,1943, under the same contract arrangements as to government-furnished material. Although it was defendant’s practice in reletting terminated portions of such contracts to solicit bids from two or more contractors, the purchase order to Brill was let without prior solicitation or en-quiries among other manufacturers. Defendant acted with reasonable promptness in reletting to Brill. A reasonable price would have been $0,745 per garment. The record of shipments accepted by defendant from Brill is as follows:

Jackets

November 24,1943-- 110
November 27,1943__2, 840
November 30,1943- 1,429
December 2,1943- 1, 508
December 4,1943- 655
December 13, 1943- 495
December 30,1943- 137
February 8, 1944-¿-- 16
Total_7,190
Not delivered- 20
Total_7, 210
15. On May 12, 1944, plaintiff wrote to the contracting officer concerning jackets shipped under the designation “Irreparables”:
During the course of our performance of the Contract the Depot rejected 8,139 [3] jackets on the ground that the material in the jackets was defective and the Depot retained those jackets without paying us therefor. The jackets were made from materials furnished by the Gov- *731 eminent and the sole reason for the jackets being rejected was the defective material furnished by the Government. There was no contributory negligence on our part. We accordingly request that you find as facts that the sole reason for the rejection of the 8,139 jackets was the defective material furnished by the Government and that there was no negligence on our part in manufacturing them. We ask that we be compensated for our services in manufacturing the 8,139 jackets, Herringbone Twill, at the price stated in the contract.
16. On January 22,1945, defendant issued and plaintiff accepted Modification “E” to the contract, which provided in part:
Whereas, By letter dated 17 March 1943, the contracting officer terminated contractor’s right to deliver 25,000 Jackets, reducing the contract quantity to 35,000, which was further reduced to 27,790 by termination of 22 October 1943, and
Whereas, The contractor has requested that the Government accept an additional quantity of 8,128 Jackets, Herringbone Twill (with Melamine Formaldehyde or Phenol Formaldehyde Buttons), and
Whereas, The aforesaid 8,128 Jackets do not conform to specifications and it is agreed that 7,623 Jackets be accepted at a reduction of 10% and 505 Jackets at a reduction of 50% in the contract unit price, and
Whereas, The Contracting Officer has found that the serviceability of the Jackets is not seriously impaired; that they are suitable for the purpose intended; that the reductions in price are just and fair, and
*****
NOW, THEEEFOEE, IT IS HEEEBY MUTUALLY AGEEED AS FOLLOWS:
1. That Contract W 669-qm-23946, dated 4 December 1942, as amended, is further amended to provide, as of the date of this Agreement, for the acceptance by the Government, in addition to the contract quantity, 7,623 Jackets, Herringbone Twill (with Melamine Formaldehyde or Phenol Formaldehyde Buttons) , which do not comply with specifications at a unit price of $.54, and 505 Jackets, Herringbone Twill (with Melamine Formaldehyde or Phenol Formaldehyde Buttons), which do not comply with specifications at a unit price of $.30.
17. Settlement of the jacket contract was effected by plaintiff’s acceptance of a voucher dated February 14,1945, in the *732 net amount of $10,780.11. Plaintiff certified that the bill was “correct and just”. The accounting details were:
22,599 Jackets at $0.60 each_$13,559.40
7,623 Jackets at $0.54 each- 4,116.42
505 Jackets at $0.30 each_ 151. 50
17, 827.32
Estimated cost of transportation of Government material due to termination withheld on Voucher #7023, July 1943_ 249.31
18,076.63
Less: Excess cost of transportation due Govern-ment_ $393.38
Excess cost of purchase due Government_ 2, 842. 75
Liquidated damages applicable to terminated and unterminated quantities_$4, 607.70
Liquidated damages withheld from payment_ 547.31
- 4,060.39
- 7,296. 52
Total due contractor- 10,780.11
TROUSERS CONTRACT — W 669-QM-24005
18. Specifications P. Q. D. 42A, governing the trousers contract, provided in part:
1. * * * All component parts of the trousers shall be cut out of one piece of material. * * *
2. * * * All component parts shall be marked to insure a uniform shade throughout the garment, except those cut from ends as indicated in operation No. 1.
19. Provisions of the Bidder’s Reference Book, quoted in finding 4, supra, were identical to those incorporated by reference in the trousers contract.
20. Article 26 of the trousers contract, entitled “Delays-Liquidated Damages”, was identical to the article of the same title in the jacket contract (finding 11 a, supra). By supplemental agreement executed August 20, 1943, the parties deleted Article 26 from the trousers contract and substituted therefor, effective August 20, 1943, a new provision entitled “Delays-Damages”, identical to that adopted a day later to the jacket contract (finding 11 i, supra).
*733 21.a. The contract specified a delivery schedule for furnishing of cloth by defendant. The schedule requirements and the actual delivery dates are as follows:

b. The contract provided as to delivery of government-furnished material:
Following notice of the availability of Government Materials, such materials if furnished by a Quartermaster Depot or installation in the same city as the point of manufacture will be delivered to contractor at said Quartermaster Depot or installation not more than once in any seven day period except on written authority of the Contracting Officer, provided that in any event the contractor shall have given at least 72 hours notice of a desire to secure same. Where a contractor has requested the release of a quantity of such materials, has given the prescribed notice, and has received notice of the availability of such material, the contractor must accept delivery thereof at the time specified. Contractors failing to do so will be required to reimburse the Government for any expense resulting from such failure.
Notices to plaintiff of availability of material, and notices by plaintiff of desire to secure material, are not in evidence.
22. The contract specified the various sizes of trousers required, the quantities in each size, and the yardage of government-furnished material to be alloived per garment in each size. The total allowance for 100,000 trousers was 293,851.39 yards.
23. The schedule of deliveries in the contract required finished trousers to be delivered by plaintiff as follows:

*734
Date due: Number of lSJfS garments

January 21_ 10,000
February 20__ 10,000
March 22_ 30,000
April 21_ 30,000
May 21_ 20,000
Total_ 100,000
24. At the time when the trousers contract was awarded, plaintiff was engaged in the performance of several other government contracts which had not yet been completed. This, plus lack of button-attaching machines, delayed initial delivery of finished trousers.
25. a. Pursuant to Section B-4 of the Bidder’s Beference Book (finding 4, supra) incorporated into the contract by reference, due to the unreasonably high percentage of defective trousers that had been found upon inspection after delivery, defendant rejected without inspection a large number of packaged trousers delivered by plaintiff. Plaintiff renumbered and reshipped to defendant many of these uninspected packages and they were again rejected by defendant without further inspection. The extent of this practice of reshipment and rejection without further inspection, as well as the record of finished trousers delivered by plaintiff and accepted by defendant, is shown in the following table:

*735 Plaintiff actually manufactured in the course of its contract performance approximately 83,500 trousers. Defendant accepted delivery of 64,532 trousers and rejected 18,374 trousers as defective, but retained possession of the latter and placed them in the category of “irreparables”.
7). The contract allowed 293,851.39 yards of material for the manufacture of 100,000 pairs of trousers. Defendant stopped furnishing cloth to plaintiff after May 29,1943 (up to which time plaintiff had received 257,897.75 yards) so that plaintiff’s manufacturing operations wound up for lack of cloth by June 26,1943. Thereafter, plaintiff’s facilities were engaged in repairing trousers which had previously been rejected by defendant for shaded parts. The final shipment and acceptance of trousers was on September 22, 1943, although so-called “irreparables” were shipped through January 19,1944.
26. a. Due to plaintiff’s failure to meet delivery requirements, on October 23, 1943, defendant terminated plaintiff’s right to deliver 35,468 pairs of trousers pursuant to contract Article 26 and, on the same day, contracted by purchase orders for 25,000 of the trousers with Blue Buckle Overall Company, Lynchburg, Virginia, at the reasonable price of $0.57 each, and with Brown Garment Manufacturing Company, Little Eock, Arkansas, for 10,468 trousers at the price of $0.61 each. In the case of each relet purchase order, price terms were f. o. b. manufacturer’s plant, the material was to be furnished by defendant, and delivery of finished trousers was to be made by December 31,1943. Defendant did not act with reasonable promptness in reletting the contracts. If it had acted with reasonable promptness defendant would have relet the contracts on June 5,1943, or one week after the last delivery of cloth to plaintiff. Each relet purchase order provided:
Delays-Liquidated Damages are not applicable.
Delays-Damages will apply to this order.
Contractor’s attention is invited to the right of the Government to charge damages resulting from delay in making deliveries (including field inspection costs incurred after the final delivery date of this order).
*736 The evidence does not disclose whether defendant assessed damages against either Blue Buckle or Brown under the relet purchase orders. Deliveries by these companies of finished and accepted trousers under the relet purchase orders were as follows:

1). Blue Buckle had offered and was able to deliver to defendant up to 40,000 trousers under the relet purchase order at $0.57 each, or more than enough to supply plaintiff’s deficiencies (35,468) under the contract. However, defendant issued a purchase order to Blue Buckle for only 25,000 trousers and issued a purchase order concurrently to Brown for 10,468 trousers, the balance of the deficiency, at $0.61 each. In effect, by placing with Blue Buckle an order for the entire deficiency, or 35,468, defendant could have saved $418.72, thereby reducing the excess cost of reletting to $177.34 plus transportation costs (see finding 40, infra).
21. On May 25, 1944, plaintiff wrote to the Contracting Officer concerning trousers shipped under the designation “irreparables”:
During the course of our performance of the contract the Depot rejected 18,386[7] pairs of Trousers, Special, Herringbone Twill (with tack buttons), on the ground that the material was defective, and the Depot retained the rejected trousers without paying us therefor. The trousers were made from materials furnished by the Government, and the sole reason for rejection of the trousers was the defective material furnished by the Government. There was no contributory negligence on our part.
Accordingly, it is requested that you find as facts that the sole reason for the rejection of the 18,386 pairs Trousers, Special, Herringbone Twill (with tack but *737 tons), was the defective material furnished by the Government and that there was no negligence upon our part in manufacturing.
We also request that we be compensated for our services in the manufacture of the 18,386 pairs Trousers, Special, Herringbone Twill (with tack buttons) at the price stated in the contract.
28. On January 22, 1945, defendant issued and plaintiff accepted Modification “F” to the contract, which provided in part:
Wheeeas, By letter dated 23 October 1943, the contracting officer terminated contractor’s right to deliver 35,468 pairs Trousers, reducing the contract quantity to 64,532, and
Whereas, The contractor has requested that the Government accept an additional quantity of 18,374 pairs Trousers, Special, Herringbone Twill (with Tack Buttons) , and
Whereas, The aforesaid 18,374 pairs Trousers do not conform to specifications and it is agreed that 17,762 pairs Trousers be accepted at a reduction of 10% and 612 pairs Trousers be accepted at a reduction of 50% in the original unit price, and
Whereas, The Contracting Officer has found that the serviceability of the Trousers is not seriously impaired; that they are suitable for the purpose intended; that the reductions in price are just and fair, and
# * H: % *
NOW, THEREFOKE, IT IS HEREBY MUTUALLY AGREED AS FOLLOWS:
1. That Contract W 669-qm-24005, dated 10 December 1942, as amended, is further amended to provide, as of the date of this Agreement, for the acceptance by the Government, in addition to the contract quantity, 17,762 pairs Trousers, Special, Herringbone Twill (with Tack Buttons), which do not conform to specifications at a unit price of $.5175 and 612 pairs Trousers, Special, Herringbone Twill (with Tack Buttons), which do not conform to specifications at a unit price of $.2875.
29. Settlement of the trousers contract was effected by plaintiff’s acceptance of a voucher dated March 14, 1945, in the net amount of $3,992.42. Plaintiff certified that the bill was “correct and just”. The accounting details were:
*738 17,762 Pairs Trousers at $0.6175_$9,191. 84
612 Pairs Trousers at $0.2876- 175. 95
-$9,867. 79
Excess cost of transportation incurred- 523. 76
8, 844.03
Excess cost of purchases_ 596. 06
Liquidated damages applicable-$9, 786.11
Withheld from prior payments_ 5,514.64
- 4,271.47
Material used in excess of contract_ 54.08
- 4,921.61
Total due contractor (paid)_ 3,922.42
plaintiff’s manufacturing mfthcods
30. Plaintiff’s manufacturing operations in the performance of both the jacket and trousers contracts were essentially the same, that is, material was spread on a cutting table, cut according to pattern, assembled, sewn, examined, packed and shipped. The material from which both jackets and trousers were made was of the same cloth and it was furnished to plaintiff by defendant for that purpose.
31. The cloth which defendant furnished to plaintiff came in bolts of material, full width, running 60 yards to 120 yards in length. In the initial operation in plaintiff’s plant this material was rolled out on a cutting table which was about 40 yards long, and which had appropriate markings at 30 yards and 35 yards to accommodate requirements for cutting according to the length of the material at hand. In the present instance, the contract required that the material should be spread face to face before cutting, so that a bolt of cloth measuring between 60 and 70 yards long was spread on the table to the thirty-yard mark and doubled back again, the excess material being cut off and put aside for use on parts not required to be matching in shade. Material which was between 70 and 80 yards in length was spread as above to the thirty-five-yard mark, and if over 80 yards in length it was spread in the same manner but to the full length of the table.
Plaintiff used about 50 or 60 bolts of cloth on a spread so that, at least in the thirty-yard section of the table, the “spread” was about 120 piles high.
*739 32. Defendant furnished to plaintiff patterns for the constituent parts of each garment and, preparatory to actual cutting of the cloth, patterns for the particular garment to be manufactured were placed on the topmost ply of the material on the cutting table, and in this way the entire “spread” was cut in one operation, thus providing constituent parts for a large number of garments. Component parts cut from each double layer of cloth (the cloth was laid “face to face”) were required to be marked with a distinctive number so that all the constituent parts of a garment could be identified with the same piece of cloth material. This was known as “shade-marking” and was required to secure, as far as possible, a uniform shade of cloth in the completed garment. The component parts were then secured in bundles and held ready for delivery to the sewing room for assembly into garments.
33. a. There were several devices in common use for “shade-marking.” In the beginning plaintiff used the Bates system which marked a number in indelible black or yellow ink directly on the material edge, but when the parts were sewn together this number was not visible. Thereafter plaintiff used the “joker” system which was a preprinted ticket stapled to each part, but this was a slow and cumbersome method, and later plaintiff secured and used a Soabar machine. The Soabar machine is a device which automatically prints the ply number, cut number, size and bundle number on a roll of tickets and fastens an appropriate ticket to each part, the number and figures changing with each part. The dates when these various methods were in use by plaintiff, or the number of garments involved in each method, are not in evidence.
b. Plaintiff had no Soabar machine at the commencement of the contracts, but rented one later, although plaintiff could have bought one had defendant not rejected plaintiff’s application for a preference rating to acquire same.
34. a. In its inspections defendant found that many garments were imperfect because of missing bartacks, open seams, drill holes, skipped stitches, raw edges, missing and misplaced buttons, defective pockets, dissimilar pockets and missing labels. In addition, a large number of garments *740 were found upon inspection to be “shaded” and were rejected by defendant for that reason. However, defendant accepted shaded garments if shade-markings on the component parts indicated that they had been cut from the same piece of material.
5. Shaded garments are garments in which the shade of the material is not uniform throughout. This condition may result from the material being spliced or overlapped before cutting, improper or inadequate shade-marking, or improper or careless assembling of the cut component parts before sewing; or it may be caused by defect in the material itself, and this latter defect may not readily be apparent “in the piece” on the cutting table.
g. Splicing of cloth, carelessness in shade-marking, mishandling of shade-marked cut component parts, and inadequate supervisory inspection all occurred in plaintiff’s plant, and, on the other hand, material which was delivered to plaintiff by defendant was defective because of variance in shade “in the piece.”
SHADED GARMENTS
35. a. As of April 20, 1943, plaintiff had shipped or reshipped, and defendant had accepted or rejected, the following quantities of garments:

b. On April 20, 1943, defendant wrote to plaintiff concerning these shipments, stating :
As a result of the failure on your part to use a proper method shade-marking in manufacturing garments under the above contracts, an excessive amount of badly shaded, completed garments have been manufactured under both contracts which cannot be repaired.
In order to segregate this type of garment from shipments under subject contracts, you are requested to make shipments of the shaded garments as follows:
*741 All badly shaded garments are to be packed as such, and are to be shipped immediately. The containers are to be clearly marked “Irreparable Garments.” These garments will be accepted for material credit only, and they must be covered by a No Charge invoice.
c. Thereafter, plaintiff returned the rejected shaded garments to defendant in containers marked “shaded garments”.
36. On May 29, 1943, plaintiff discovered that a quantity of cloth material received that day which at that time was on the table ready for cutting was not of uniform shade and he brought the matter to the attention of the contracting officer in a letter dated June 3,1943, which read as follows:
Upon checking our producting [sic], we find that some garments are coming through with shaded parts even though all component parts of the garment are soabar ticketed.
Upon investigation we find that the last lot of Herringbone Twill delivered to us was not dyed evenly. We have come across a few pieces that show a gradual change in shade from the beginning to the end of the piece. In spreading this material prior to cutting it is impossible for us to see the change in shade as there is no sharp line of demarcation.
We are making an effort to watch this very closely and where we note a difference we are putting these pieces aside awaiting final disposition.
With reference to the shaded garments, however, we feel that we have exercised due care in production in that all parts are ticketed.
37. Plaintiff also immediately called the matter to the attention of the Government inspector who was present in the plant at that time, and the inspector forwarded samples of the shaded material to the contracting officer with a letter, dated May 31,1943, stating:
Under separate cover I am sending you all component parts to two pair of trousers and a piece of material to illustrate how badly shaded the last shipment of material is running.
Mr. Rose has called my attention to this condition and I have actually witnessed it myself in the spreading of the cloth. Mr. Rose has cautioned his cutters and spreaders to be on the alert for this condition. It is, however, impossible at times to notice the different shades while spreading. Some garments are likely to be *742 made up and found to be shaded due to this condition.
All parts are now being soabared as you can see from the parts sent. In some cases, as in the pockets of the parts sent you the shade is completely off and only due to the fact that you can see the decided break in the fronts of the trousers would you believe it to be from the same piece of cloth.
38. The evidence does not disclose, and it is not possible to determine, how many garments were shaded because of plaintiff’s inefficiency, or how many were shaded because of defective material furnished by defendant to plaintiff for the manufacture of the garments.

Extra Costs

39. a. In procuring jackets from Puritan and Brill by relet purchase orders (findings 12 and 14, supra), defendant incurred costs in excess of the original contract of $3,240.63 ($2,847.25 for manufacturing costs plus $393.38 for costs of transporting cloth and finished garments).
5. Of this extra cost $576.80 paid to Brill was in excess of the reasonable market price (finding 14, supra).
40. a. In procuring trousers from Blue Buckle and Brown (finding 26, supra), defendant incurred excess costs of $1,119.82 and withheld same from plaintiff. Defendant also withheld from plaintiff $54.08 for excess cloth used by plaintiff in the performance of its share of the original contract.
b. If defendant had relet the entire terminated portion of the contract to Blue Buckle instead of reletting part to Brown at a higher unit rate, defendant’s extra costs would have been reduced to $729.56.

Liquidated Damages

41. a. In accordance with the provisions of Article 26 of the contract, defendant assessed against plaintiff as liquidated damages for delays in delivery under the jacket contract the sum of $4,407.70. The delays were calculated through August 20, 1943, this being the final effective date of Article 26 prior to its deletion and substitution by a “Delays-Damages” clause (finding 115 supra). The elements of the amount charged were:
*743 On total accepted deliveries from plaintiff_$2, 530. 52
On deliveries by Puritan- 876.33
On deliveries by Brill_ 1,000.85
Total_ 4,407.70
b. The liquidated damages of $2,530.52 withheld by defendant on total accepted deliveries from plaintiff includes $381.78 allocable to 8,128 “irreparables,” which were delivered and initially rejected before they were marked “irreparables” and reshipped. They were ultimately accepted by defendant at reduced rates (finding 16, supra). While the dates of reshipment of the garments marked “ir-reparables” were later than the delivery dates required by contract, the $381.78 represents liquidated damages for only that period of time commencing with the reshipment of the garments marked as “irreparables” and ending with the cutoff date of August 20,1943. The ultimate acceptance of these “irreparables” was by supplemental agreement and did not constitute delivery under the contract. Defendant properly withheld from plaintiff $381.78.
42. a. In accordance with the provisions of Article 26 of the contract, defendant assessed against plaintiff as liquidated damages for delays in delivery under the trousers contract the sum of $9,786.11. The delays were calculated through August 19,1946, this being the final effective date of Article 26 prior to its deletion and substitution by a “Delays-Damages” clause (finding 20, supra). The elements of the amount charged were:
On total accepted deliveries from plaintiff_$5,654. 65
On deliveries by Blue Buckle and Brown_ 4,131.46
Total- 9, 786.11
b. The liquidated damages of $5,654.65 withheld by defendant on total accepted deliveries from plaintiff includes $1,510.48 allocable to 18,874 “irreparables,” which were delivered and initially rejected before they were marked “irreparables” and reshipped. They were ultimately accepted by defendant at reduced rates (finding 28, supra). While the dates of reshipment of the garments marked “ir-reparables” were later than the delivery dates required by contract, the $1,510.48 represents liquidated damages for *744 only that period of time commencing with the reshipment of the garments marked as “irreparables” and ending with the cut-off date of August 19, 1943. The ultimate acceptance of these “irreparables” was by supplemental agreement and did not constitute delivery under the contract. Defendant properly withheld from plaintiff $1,510.48.
o. If defendant had relet the terminated portion of the contract on June 5, 1943, as reasonable promptness would have required (finding 26, supra), it is reasonable to assume that deliveries of 23,976 completed trousers under the relet contracts would have been made sufficiently prior to August 19,1943, to have resulted in liquidated damages of $3,530.06 instead of $4,131.46 being withheld under the terminated portion of the contract.
d. Defendant’s liquidated damages against plaintiff on the trousers contract are as follows:
On total accepted deliveries from plaintiff_$5,654 65
On deliveries from Blue Buckle and Brown- 3,530. 06
Total_ 9,184 71
43. a. The following schedule recapitulates the actual moneys withheld by defendant from plaintiff for extra costs and liquidated damages, against revised figures representing the amounts defendant should have withheld (reflecting eliminations in findings 405 and 42c) :
Excess costs: Withheld Revised
Jackets-§3,240.63 $2,663.83
Trousers-1,173.90 729.56
Liquidated damages:
Jackets-4,407.70 4,407.70
Trousers-9, 786.11 9,184 71
Total. 18, 608.34 16, 985. 80
b. Defendant improperly withheld from plaintiff $1,622.54.

Administrative Action

44. On February 6, 1945, the contracting officer rejected plaintiff’s requests for relief from liquidated damages assessed under both contracts without making adequate findings of fact on the causes of the delays. On January 29, 1946, dismissing appeals timely filed by plaintiff to the ruling of *745 tbe contracting officer, the War Department Board of Contract Appeals held that, while the contracting officer had failed to make findings of fact on the causes of delays which plaintiff had claimed were excusable under the contracts, he was not required to do so because plaintiff had failed to notify the contracting officer in writing within ten days from the beginning of each delay of the causes therefor. The record contains no evidence that plaintiff had so notified the contracting officer.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that he recover of and from the United States one thousand six hundred twenty-two dollars and fifty-four cents ($1,622.54).

 Later changed by agreement to 8,128 (finding 16, infra).

 Subsequently reduced to 18,374 by agreement (finding 28, infra).