**UNITED STATES of America,
Plaintiff,**

v.

**RUSSELL ELECTRIC CO., Defendant.**

United States District Court
S. D. New York.

July 22, 1965.

Additional Findings of Fact and Conclusions of Law Nov. 15, 1965.

**6**

Robert M. Morgenthau, U. S. Atty., New York City, for plaintiff, David E. Montgomery, New York City, of counsel.

Sherman & Goldring, New York City, for defendant, Irving Michael Atkin, Bernard Kahn, New York City, of counsel.

COOPER, District Judge.

This is an action for money damages arising from an alleged breach of contract.

Commenced July 6, 1959 by the filing of a complaint, issue was joined by service of an answer on September 4, 1959. The cause was tried before the Court and a jury on February 5, 8, 9 and 10, 1965.

Defendant moved for a directed verdict at the close of plaintiff's case (Tr. 270).[1] After argument by both sides, this motion was denied (Tr. 270–296).

At the close of the entire case, plaintiff and defendant agreed to waive jury trial of the fact issues (Tr. 383).

Having rested, both sides moved for directed verdicts. Defendant moved for dismissal of the complaint on the entire record (Tr. 386). Decision on these motions was reserved pending submission of post-trial memoranda and proposed findings of fact and conclusions of law.

### FACTS

#### The Contract

In April, 1951, the United States of America, by its agent, the United States Naval Ordnance Plant at Indianapolis, Indiana (hereinafter NOP), solicited bids on Contract N163s–947 (hereinafter Contract 947) relating to gyro motors. These motors were to be used in a sighting unit which was being developed by NOP for use in fighter aircraft (Tr. 231–33).

NOP received bids for Contract 947 as follows (Exs. 2–7):

| Company | Unit Price |
|---|---|
| John Oster Manufacturing Co. | $30.20 |
| Universal Electric Company | 23.43 |
| A. C. Gilbert Company | 22.31 |
| Redmond Company, Inc. | 17.25 |
| Russell Electric Company | 14.12 |

On or about May 14, 1951, NOP awarded Contract 947 to Russell Electric Company (hereinafter Russell). Russell's bid had been signed by William Lightfoot, its General Manager. Commander Lloyd B. Clapham, Jr. was the Contracting Officer for NOP (Ex. 2).

Pursuant to Contract 947, Russell undertook to develop 5 sample motors to NOP's satisfaction before commencing production (Ex. 2, p. 2); furnish NOP manufacturing drawings (Ex. 2, p. 6); produce all special tooling necessary for the production of the motors (Ex. 2, p. 2); deliver the tooling to NOP "upon

---

1. "Tr." followed by a number refers to pages of the Transcript of Trial Proceedings. "Ex" followed by a number or letter refers to an exhibit in evidence.

completion of the Contract" (Ex. 2, p. 5); and deliver 7,100 production motors no later than January 31, 1952 (Ex. 2, p. 6). Delivery of motors was scheduled as follows: 500 by August 15, 1951; 1,000 in September, 1951; and 1,500 per month thereafter until the full 7,100 motors had been delivered (Ex. 2, p. 6).

The United States agreed, under Contract 947, to pay Russell $113,917 for the 7,100 gyro motors ($14.12 each), and $13,665 for the special tooling (Ex. 2, p. 2). As later modified, Contract 947 provided for payment by the United States of $133,881, including special tooling and 7,100 gyro motors ($14.11493 each).

### Termination, Reletting, Claimed Damages

Section 11(a) of the General Provisions of Contract 947 (Ex. 2, pp. 13–14) provides:

11. DEFAULT

(a) The Government may * * * by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:

(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or .

(ii) if the Contractor fails to perform any of the other provisions of this contract, or so fails to make progress as to endanger performance of this contract in accordance with its terms, and in either of these two circumstances does not cure such failure within a period of 10 days . . . after receipt of notice from the Contracting officer specifying such failure.

On August 13, 1952, Redmond Manufacturing Co., Inc. (hereinafter Red-

mond) wrote Russell that it would no longer produce motors for Russell under Contract 947 as had been previously arranged [2] (Ex. 58). A copy of this letter was sent to NOP.

NOP regarded performance under Contract 947 in danger. The need for motors was pressing (Tr. 135). It appeared delivery would not be forthcoming or, at best, unduly delayed. Accordingly, by letter dated August 22, 1952, the Contracting Officer, Commander Clapham, wrote Russell, advising (Ex. 61):

Deliveries of such supplies shall be cured and acceptable evidence that performance will not be delayed shall be furnished * * * within ten (10) days after receipt of this letter; if such is not done, the contract will be cancelled for default in accordance with Section 11(a) (ii) of the contract.

Russell failed to reply to NOP's "warning" letter. Commander Clapham, under date of September 11, 1962, then wrote Russell (Ex. 62, Tr. 122):

* * * in accordance with Section 11, General Provisions, Contract N163s–947 is terminated for default, with respect to the undelivered balance * * * [specifying the items].

Five bids were received (between September 8 and October 2) in response to NOP's solicitation of ten companies for price quotations on a replacement contract (Exs. 64–28, Tr. 128–69). Because Redmond offered the best delivery schedule and the Navy's need for the gyro motors was urgent, the Contracting Officer accepted Redmond's bid even though others had submitted lower quotations (Tr. 135). Russell interposes no claim that NOP should have accepted another bid (Tr. 239–42); 243–44; 300–02; see Tr. 135; Ex. 2, Article 11(c).

2. Redmond's relationship with Russell and their contact with NOP is discussed infra, pp. 8–17. Suffice it to note here that all manufacturing and delivery of motors under Russell's Contract 947 was

made by Redmond. NOP regarded Redmond as Russell's subcontractor. Russell, on the other hand, claims Redmond was its assignee.

At the time of termination, September 11, 1952, according to the Government, 6,935 motors remained to be delivered under Contract 947. It contends that as a result of administrative error, the replacement contract (Exhibit 63, Contract 163s–2261) entered into between NOP and Redmond on October 15, 1952, called for delivery of 6,768 gyro motors (Ex. 63, Tr. 126–27, see Exs. 64–68 at a unit price of $39.87.

The United States, in this action, seeks to recover damages resulting from Russell's default under Contract 947 as measured by the difference between the cost under the replacement contract and what would have been the cost under Contract 947 had Russell not defaulted. The excess costs amount to a total of $180,745.96.[3]

### Relationship of the Parties

As we see it, Russell contends that during the fall of 1951 it abandoned and repudiated Contract 947; NOP knew of the abandonment; NOP then had a duty to and could have, but completely failed to, mitigate damages; this requires a finding for defendant. Such a result, it is further advanced, would also be reached by the alternative argument that it was the Navy which caused Redmond to cease performing by August, 1952 and any breach of contract attributed to Russell was, at that time, the result of NOP's hindrance of performance and a further failure to mitigate damages. Russell also questions NOP's allocation of motors

delivered by Redmond under gyro motor contracts other than 947 and the appropriate measure of damages.

The Government, in brief, says it entered Contract 947 with Russell; Russell did not communicate to NOP any intent to abandon and repudiate the contract; rather, assurances of performance were forthcoming by Redmond, which "acted for Russell"; ultimately, after deliveries had begun, Redmond established itself as Russell's subcontractor, with NOP's consent; after Redmond's refusal to make further deliveries, Russell was given an opportunity to assume performance; absent such assurance, termination for default was proper; and Russell is thus liable for damages under the contract.

At the heart of the controversy is the relationship between the parties and with Redmond. We thus turn to view the evidence (largely undisputed) as it bears on those relationships.

### 1. May 1951 to February, 1952

Contract 947 was awarded in mid-May, 1951. Russell, an Illinois corporation, was at that time a wholly owned subsidiary of Raytheon Manufacturing Company of Boston, Massachusetts. A manufacturer of fractional horsepower electric motors, Russell maintained a manufacturing plant in Chicago, Illinois (Tr. 83–84).

On May 31, 1951, a Mr. Charles Frost purchased from Raytheon Manufactur-

3.

| Costs Under Replacement Contract with Redmond | | |
|---|---|---|
| Description | Unit Price | Amount |
| 6,768 motors | $ 39.87 | $269,840.16 |
| Tools, dies, etc. | 20,136.65 | 20,136.65 |
| | | 289,976.81 |

| Costs under Contract 947 with Russell | | |
|---|---|---|
| Description | Unit Price | Amount |
| 6,768 motors | $ 14.11493 | $ 95,529.85 |
| Grease | 36.00 | 36.00 |
| Tools, dies, etc. | 13,665.00 | 13,665.00 |
| | | 109,230.85 |

Excess Costs
$ 289,976.81
−109,230.85
$ 180,745.96

ing Company Russell's entire outstanding capital stock at a nominal price (Tr. 86). He arranged for an institutional financing company to acquire Russell's indebtedness to Raytheon (Tr. 83–84). This acquisition was secured by a mortgage on Russell's assets.

Throughout 1951 and 1952, Mr. Frost also owned 30 percent, and his children an additional 14 percent, of the outstanding stock of Redmond, a Michigan corporation with offices and a manufacturing facility in Owosso, Michigan. Another 44 percent of Redmond's outstanding stock was owned by its President, Mr. Frank Campbell and his family. Redmond was a manufacturer, like Russell, of fractional horsepower electric motors.

Sometime before September, 1951, Mr. Frost concluded that Russell had an inefficient organization and an incompetent staff. He had decided to discontinue its operations and liquidate certain of its assets (Tr. 96–97).

At his request, Redmond executives during the summer of 1951 had made a study of Russell's business (Ex. 52; Tr. 96–97), Mr. Frost became aware that Russell had two contracts with the Navy, Contract 947 dealing with gyro motors and a two-part contract for development and production of a different motor called a "synchro".

Concerned with completing these contracts, Mr. Frost engaged Colonel Michael Looney, an attorney practicing in Washington, D. C. and familiar with government contracts, to examine them and advise whether they could be performed by other contractors (Tr. 377).

Mr. Frost wanted Redmond to undertake performance on both contracts (Tr. 98). Despite a working relationship between Redmond and Russell beginning in June, 1951 (Exs. 8, 52a), Redmond expressed reluctance to assume Russell's manufacturing duties under the synchro contract (Tr. 96–97, 333, 378). However, during the summer of 1951, an agreement was reached between Russell and Redmond whereby Redmond agreed to carry out the production of gyro motors called for by Contract 947 (Tr. 97–98; 307–8).

Redmond had been advised by Colonel Looney that there would be no problem in performing under the Russell gyro contract (Ex. 2) if the Navy would accept them (see Tr. 315), but the then current Navy Regulations required a transferee of a Navy contract to take over all other contracts the Navy had with the transferor (Tr. 378–80; cf. Ex. 16–7). Russell was apparently unable to secure Redmond's consent to undertake Russell's manufacturing duties on the "synchro" contract (Tr. 334–35).

Pursuant to Redmond's agreement with Russell to perform on Contract 947, Russell transferred its machinery for the production of the gyro motors to Redmond in the fall of 1951 (Tr. 98, 315; Exs. 9–10, 12–14).

NOP was informed by a series of letters between Russell and NOP, and NOP and Redmond, written between July and September, 1951, of some relationship between Russell and Redmond with respect to Contract 947 (Tr. 32–33; Exs. 8–14).

Overall, this correspondence indicated that Russell had been purchased by Redmond stockholders; Russell's facilities were being consolidated with Redmond's in Owosso, Michigan; and Redmond would take over production of the gyro motor.

Specifically, Russell stated to NOP in a letter dated July 2, 1951 that effective June 1, 1951, Russell had been purchased by Redmond stockholders. "Since this was not a direct purchase by * * * Redmond * * * Russell will continue to operate as a separate company for the present" (Ex. 8). Russell explained how it would be working closely with Redmond and stated "[i]t is planned that this association will help us be of greater service to you in the future" (Ex. 8).

By letter dated August 24, 1951, Russell *informed* NOP that (Ex. 9):

> * * * business conditions have made it necessary to consolidate the facilities of Russell * * * with those of * * * Redmond * * *. Present plans call for the cessation of all operations in the Russell * * * plant on November 1, 1951. Every effort will be made to insure no delay or interruption of shipments required to fill customer schedules. * * *

Russell closes by expressing confidence that Redmond "will satisfactorily serve you in all respects."

While this letter announces future "service" by Redmond, it does not state that Russell wants to be or considers itself thereby relieved of its responsibilities under Contract 947. Indeed, Russell's letter assures performance, albeit from "consolidated facilities" at a manufacturing plant other than the one it had designated in its contract with the Government (Ex. 2, p. 6; Ex. 9).

Redmond phrased the matter in other terms. By letter to NOP dated August 29, 1951 (Ex. 10), Redmond declared that "Russell * * * is being eliminated and all manufacturing facilities are being moved to * * * Redmond * * at Owosso * * *." Redmond requested that Contract 947 be "re-issu[ed]" to it so "paper work can be handled under the proper manufacturer's name." Redmond further assured NOP that work on drawings and production tooling was being continued (Ex. 10).

NOP responded promptly. By letter dated September 5, 1951, NOP wrote Russell, with a copy to Redmond, acknowledging Russell's letter of August 24 and advising

> that the subject contract [947] exists between the Government and * * * Russell * * * and that *no other outside party can be considered a party to the contract irregardless [sic] of the financial or*

*organizational changes made by the Contractor.* The Government cannot relinquish its rights under the contract and must hold the Russell Electric Company to its agreement to deliver at the time specified. If * * * Russell * * * cannot deliver the motors contracted for and so notifies this plant in writing, then the contract will be terminated for default * * *. [Ex. 11] [Emphasis added]

This letter further pointed out that neither a satisfactory sample nor the 500 motors due August 15, 1951 had been delivered. Added delay was unacceptable since, as NOP viewed it, the need for the motors "was becoming acute." Russell was thus asked in unambiguous terms to notify NOP immediately if it intended to complete its contract and if so, when deliveries could be expected.

No reply to NOP's letter of September 5 (Ex. 11) from Russell was forthcoming. However, on September 10, 1951 Redmond wrote NOP (Ex. 12) explaining that the consolidation of Russell activities within Redmond plants would cause difficulties for Russell customers "because of problems not clearly understood at this time." Without more, Redmond asked NOP's indulgence and, to aid in the transition, a cancellation of "purchase orders" placed with Russell and their reissuance on Redmond.[4]

Redmond, furthermore, undertook to answer NOP's letter to Russell (Ex. 11) dated September 5, 1951. Redmond reported to NOP by a letter dated September 20, 1951, that an inspection of Russell's files showed about 85 percent of tooling completed, with the balance to be furnished by November 1st. Redmond stated that "[w]ith the purchase of the Russell Electric Company, we are endeavoring to fulfill all of their commitments, including delivery promises to their customers." (Ex. 13).

Moreover, Redmond indicated that manufacturing would begin in mid-No-

---

4. In using the term "purchase orders," Redmond was apparently making an oblique reference to Contract 947 (Ex. 2).

vember, 1951 and that production was likely to start at the rate of 150 motors per day in late November (Ex. 13). We note that production at that rate would not make unreasonable, as of late September, 1951, the expectation that substantial performance on Contract 947 could be had by January 31, 1952, the final delivery date under Contract 947.

In its letter of September 20th [Ex. 13], Redmond asked NOP to "[initiate] whatever paper work is necessary to have the contract [947] transferred * * *" to Redmond (cf. Exs. 10, 12, 14).

NOP correctly understood, and Redmond had earlier been advised, that Navy Regulations then in force required the execution of a novation agreement to assign or transfer a contract from a contractor to a third party (Exs. 16, 17; Tr. 38–42; 200–03; see Ex. 18; Tr. 143).

NOP had written the Bureau of Supplies and Accounts (hereinafter BSA) on September 18, 1951 requesting it to use its authority to execute a novation agreement (Ex. 15–17; Tr. 37–40). In so writing, NOP stated its view that Redmond had purchased Russell and that the latter had one active contract pending at NOP (Ex. 15).

Also on September 18, 1951, NOP wrote Redmond that steps were taken to have a novation agreement executed and advised Redmond to expect a communication from BSA (Ex. 18).[5]

BSA wrote Russell on September 25, 1951 and requested information with respect to its other Navy contracts (Ex. 19). The Navy apparently maintained no central file of its contract awards (Tr. 44).

Although deliveries under Contract 947 began in October, 1951, no answer had been received to BSA's letter of September 25 (Ex. 19). NOP wrote Redmond on December 4, indicating that Russell had failed to answer and requested a prompt reply (Ex. 20). Two days later, BSA again wrote Russell seeking information regarding Russell's contracts with the Navy and certain corporate documents (Ex. 21). A copy was sent to Redmond.

It was BSA's understanding that Russell's corporate charter had been amended and its name changed (Ex. 21; see Ex. 17). NOP itself reasonably lacked precise understanding of Russell's intercorporate dealings with Redmond (Ex. 23, ¶ 1; see Ex. 12). Redmond itself acknowledged to NOP by letter dated January 3, 1952 (Ex. 22):

> You have been advised that * * * Redmond * * * has purchased * * * Russell * * * of 4501 South Western Boulevard, Chicago, Illinois, and although we commonly refer to the transaction as such, this is not true in all details. * * Russell * * * was purchased by one of the major stockholders of * * * Redmond * * * and will continue to operate a business office at 332 South Michigan Avenue, Chicago, Illinois * * *.[6]

Neither Russell nor Redmond, however, supplied the information requested (Ex. 1, ¶28). Russell urges its failure to do so as consistent with its purported

---

5. A copy was sent to Russell. BSA had, and NOP lacked, the authority to enter a novation agreement on behalf of the Government (Ex. 16–7, Tr. 37–40). It should be noted that Russell itself did not request either agency to transfer Contract 947, or to approve an assignment or novation with Redmond. However, Russell was on notice concerning the correspondence; it knew Redmond's letters were signed "For the Russell Electric Company"; and so armed, neither disavowed performance nor communicated lack of approval of the proposals. As is set forth infra p. 16, Russell suggested Redmond act as its subcontractor and, in April of 1952, its Board of Directors at a special meeting approved assignment to Redmond of Russell's right, title and interest in the contract (Ex. 52).

6. Redmond further explained that it was given the opportunity to purchase certain Russell assets, among which were "also some unfilled orders at the consent of Russell customers" (Ex. 22). It apparently regarded Contract 947 as one of those orders. See p. 13 infra.

abandonment of Contract 947 in the fall of 1951. Further, Russell explains Redmond's failure on the ground Redmond did not want to be substituted on the synchro contract.[7]

There is, nonetheless, no persuasive evidence that NOP, prior to late August, 1952, knew or could reasonably be expected to know that Russell had intended or did repudiate or abandon Contract 947; or, that it knew or could be reasonably expected to know, before the summer of 1952, if then, the precise nature of Redmond's concern about a novation agreement.

Mr. Felix M. Barker, a civilian employee working under Commander Clapham at NOP, charged with administering Contract 947, could recall at trial no specific reference to a synchro contract (Tr. 203). The correspondence makes no specific mention of it, nor does the record reveal: (1) the Government in fact insisted upon Redmond assuming all Russell's contracts with the Navy as a condition of novation or (2) faced with such insistence, Russell or Redmond attempted to negotiate with BSA a waiver of the novation regulations.[8]

Rather, by letter dated January 3, 1952, Redmond wrote NOP, with a copy to BSA, explaining that it was unable to furnish information regarding other prime contracts between Russell and the Navy (Ex. 22). No explanation is given in the letter, nor is issue there taken as to NOP's characterization of Redmond's prior requests for transfer or reissuance of Contract 947 as requests for a "novation." It was thus apparent to NOP that neither Russell nor Redmond would provide information known by them as necessary as a prelude to further steps to effect a novation.[9]

Redmond's January 3rd letter reiterated its wish that the gyro motor contract (Ex. 2) be transferred to it; however (Ex. 22):

> If you cannot find suitable channels to execute this action, we should perhaps establish ourselves as subcontractors to what is left of the Russell organization, but we would want to carry out all manufacturing, shipping and billing on Redmond forms * * *.[10]

This proposal originated with and was approved by Russell's sole stockholder, Mr. Frost (Tr. 312–13).[11]

7. Redmond viewed Russell as subject to a number of liabilities (Tr. 333; see Tr. 96), of which the synchro contract was thought to be one (Tr. 334–75; 374–35; 378). Redmond was concerned lest the Navy, as a condition of transferring the gyro motor contract (947), would insist it assume the contractor's duties under the synchro contract (Tr. 337). Nowhere, however, does it appear that Redmond clearly expressed this concern to NOP or *sought to eliminate it by negotation with* BSA (see Tr. 185–88, 216).

8. The production or use of synchro motors were in no wise dependent on the production or use of gyro motors and, of course, no clause in Contract 947 relates to synchro motors or other Contracts Russell may have had with the Navy.

9. As late as July 21, 1952, NOP offered to aid in execution of a novation agreement if the necessary information could be provided (Ex. 46).

10. By the end of 1951, Russell's manufacturing facilities had been liquidated (Tr.

306–7, 11; Ex. 22 ¶22; Ex. J). NOP knew "that after September or October, 1951" Russell was no longer "an operating manufacturing company" (Tr. 185, see p. 10 supra). NOP, however, considered Russell a legal entity, entitled throughout to do business and remaining bound by Contract 947 (Tr. 188).

11. Mr. Barker's testimony does not indicate otherwise. His testimony: "I wrote a letter that says—set ourselves up as a contract here" is an inaccurate paraphrase of NOP's letter to Redmond dated January 10, 1952 (Ex. 23) written in response to Redmond's letter of January 3, 1952 (Ex. 22). See Tr. 219, Ex. 22, p. 1 ¶4. Some confusion in Barker's testimony, particularly on cross-examination, was not unexpected (see Tr. 161, 164) in light of disclosures early made to the Court (Tr. 17 ff). The inconsistency here is not of such a nature that would lead the Court to discredit the truthfulness of his testimony.

On January 10, 1952, NOP wrote Redmond, with a copy to Russell, stating that NOP's request to BSA for a novation agreement would be cancelled in view of the inability to secure the necessary information (Ex. 23). Further,

it is believed that you should establish yourself as a subcontractor of the Russell organization. Billings should be made on Russell letterhead. If Russell letterhead is not available, such should be prepared by typing. The certificate must be signed by an authorized agent of the Russell organization. Manufacturing and shipping may be accomplished on Redmond forms.

Redmond replied by letter dated February 13, 1952 stating it was setting itself up as a subcontractor to Russell and that Russell invoices would be submitted for motors delivered (Ex. 25).

An arrangement had been made between Russell and Redmond by which Redmond would act as subcontractor to Russell on Contract 947 (Tr. 312–13; see Tr. 97–98, 307–8). The details of the agreement, not delineated in the record, were not communicated to NOP. There is no dispute, however, that all motors delivered under Contract 947, beginning with October of 1951, were manufactured and shipped, as NOP had been informed, from the "consolidated" facilities at Redmond's plant in Owosso, Michigan (see Ex. 1, ¶11).

### 2. Contract Modification, Performance and Payment

Contract 947 was modified on four occasions. Three modifications, under dates of August 22, 1951 and January 10 and 25, 1952 respectively, relate to total purchase price because of changes in manufacturing or materials supplied by the Government (Ex. 2, pp. 19–21, 23–

24). These changes, addressed by NOP as proposals to Russell, were "accepted and approved" over the signature of Harvey B. Wilgus, "Redmond Co., Inc. for Russell Electric Co." [12]

A fourth modification was prompted by necessary technical alterations in the gyro motor (Ex. 2, p. 23). Entitled "Change Order #2," this modification dated October 10, 1951 was addressed to Redmond because "it was not desired to cause a delay in delivery due to non-existence of a novation agreement" (Ex. 23, ¶3).

NOP engineers had authority to effect technical alterations on the gyro motors and dealt with Redmond employees beginning in October, 1951, in so doing (Ex. 2, p. 23; Exs. F, G, H, I; Tr. 254, 264, 266). Apparently there were many engineering problems on this important new piece of electrical equipment which were finally solved by Navy and Redmond personnel. The parties agree that the engineering difficulties do not relate to Russell's liability under Contract 947 (Tr. 267). See 5 McBride and Wachtel, Government Contracts, §§ 36.100 [1], 36.100[5].

NOP proposed a fifth modification on January 16, 1952. Due to increased requirements, it sought to add 400 gyro motors to the 7,100 previously ordered (Ex. 53). Russell returned the change order unsigned and without explanation. By letter dated March 24, 1952 NOP called Russell's attention to this, regarding it as an apparent oversight, and asked for prompt acceptance (Ex. 54). The change order, however, was not signed (Ex. 53–5; Tr. 105), nor did Russell directly respond to NOP's letter of March 24.

A response was nonetheless forthcoming. Although no copy of the March 24 letter of NOP was sent to Redmond,

---

12. The January, 1952 modifications were signed (Ex. 27):

H. B. Wilgus
Manager, Special Products Sales
Redmond Company, Inc. for
Russell Electric Company

NOP received a letter dated April 10 over the following signature (Ex. 55):

REDMOND COMPANY, INC.
/s/ H. B. Wilgus
Manager, Special Products Sales
(FOR RUSSELL ELECTRIC
COMPANY)

The letter stated in part (Ex. 55):

In reply to your letter of March 24, we are very sorry that we have been unable to return your change order number 5 sooner.

\* \* \* \* \*

We will manufacture the additional 400 units at a price of $30.12 each. This increase is due to the increased cost of procuring and processing small lots of material.

Terms would be the same as present contract terms with delivery to follow the completion of present contract \* \* \*.

\* \* \* \* \*

Commander Clapham's handwritten notation on the letter (Ex. 55) pointedly observed:

Do not accept price of $30.12. Current price of $14.12.

Since the current price [that under Contract 947] was evidently unacceptable to Russell, for whom Wilgus wrote, the Commander continued:

Get competition on a separate procurement. Give Redmond a chance to bid.[13]

Ultimately, NOP issued Contract N 163s–1982 (hereinafter Contract 1982) to Redmond (Ex. 56; Tr. 106–12). It called for delivery by January 16, 1953 of 400 gyro motors at a unit price of $30.12. Dated May 15, 1952, it was signed by NOP on June 20, 1952, but not until after a series of inconclusive letters did Redmond, under date of August 13, 1952, sign and return Contract 1982 (Ex. 56–7, 74–5; Tr. 112, 227).

Redmond wrote NOP on August 13 stating it would "[f]orthwith \* \* \* start producing and shipping units \* \* under our Contract" 1982 (Ex. 58).

On the same date, Redmond had written Russell claiming that since NOP declined to pay for all gyro motors received (under Russell's Contract 947), Redmond *could make no further shipments for which it lacked assurance of payment.* "Accordingly," Redmond stated, "our arrangements are hereby terminated and no further shipments will be made" (Ex. 58).

Redmond sent to NOP a copy of its letter to Russell and pointed out that "no provision having been made for payment by the Navy for the units [on Contract 947] \* \* \* which they have received, there was no alternative" available but to cease producing for Russell. This letter precipitated NOP's notice to Russell, by letter dated August 22, requiring Russell to furnish evidence of forthcoming performance (Ex. 61; see p. 7, supra).

Prior to Contract 947 being terminated on September 11, 1952 (Ex. 61, Tr. 122), Redmond had made two deliveries of gyro motors under Contract 1982 (Ex. 1, ¶¶20, 23). On August 6, 1952, two sets of 60 motors each were received by NOP (Ex. 1, ¶¶15, 19, 20). For one of these sets, a Redmond invoice (dated July 25, 1952) under Contract 947 bearing an assignment from Russell was received (July 30, 1952). Russell was ultimately paid (by check issued September 19, 1952) after submission of a proper invoice (Ex. 51 dated September 9, 1952) (see p. 15, infra). For the other set, Redmond was paid on the basis of a Redmond invoice (dated August 21, 1952) submitted under Contract 1982 (Ex. 1, ¶23; Ex. 59; Tr. 116).

On August 14, 1952, NOP received 78 gyro motors for which a Redmond invoice (dated September 8, 1952) under

---

13. Redmond had originally bid $17.25 per motor for Contract 947 (Ex. 4). Defendant's Supplemental Memorandum After Trial contends, at pages four through seven, that NOP could have obtained gyro motors from Redmond at $14.12 prior to August 13, 1952 by arranging direct payment to Redmond. See Exhibits 55–6; note 32, infra.

Contract 1982 was submitted and upon which Redmond was paid (Exs. 1, ¶¶ 15, 23; 59).

Redmond's "no further performance" letter to Russell of August 13 pointed in part to NOP's failure to pay for motors shipped (Ex. 58). This was unjustified, especially in view of Redmond's own understanding that Russell was the prime contractor and clearly Russell invoices were to be submitted for motors delivered (Ex. 25).[14] Moreover, NOP never refused payment against Russell invoices. By August 13, NOP had accepted 32 motors for which Russell invoices were submitted (Tr. 115) and on 19 of these Russell had been paid.[15]

As of August 13, NOP retained 201 motors for which payment had not been made (Tr. 115).[16] For 141 of these, NOP had received only Redmond invoices bearing Russell's assignment (Tr. 116).

As discussed infra, pp. 15–16 [17] Russell invoices for 144 motors (those of the 141 accepted by NOP) were received on September 11, 1952 and payment to Russell was made on September 19, 1952 (Tr. 79–82, 116; Ex. 1, ¶22, Exs. 48–51). Nothing in the record reflects that had Redmond arranged for the prompt submission of proper invoices that Russell would not have been promptly paid. (See Ex. 47, Tr. 176). Moreover, nowhere does it appear that Redmond complained to NOP that payments to Russell for delivered motors were overdue or in default.

Indeed, Russell was paid for each of 165 motors delivered under Contract 947 which were accepted by the Navy (Ex. 1, ¶¶19, 22).

Such deliveries had been made and were accepted or rejected by NOP as follows (Ex. 1, ¶¶12–14, 16, 19):

| Date Received | Amount Received | Amount Accepted | Amount Rejected |
| --- | --- | --- | --- |
| 10–16–51 | 5 | | 5 |
| 11–19–51 | 5 | 5 | |
| 2 –1 –52 | 5 | | 5 |
| 3 –31–52 | 8 | 8 | |
| 4 –8 –52 | 5 | | 5 |
| 4 –14–52 | 5 | | 5 |
| 4 –16–52 | 3 | | 3 |
| 4 –21–52 | 3 | | 3 |
| 5 – 1–52 | 11 | 11 | |
| 5 – 5–52 | 2 | | 2 |
| 5 – 9–52 | 10 | 2 | 8 |
| 5 –12–52 | 2 | | 2 |
| 5 –19–52 | 18 | 6 | 12 |
| 6 –16–52 | 8 | | 8 |
| 7 –2 –52 | 13 | 13 | |
| 7 –12–52 | 20 | 20 | |
| 7 –21–52 | 40 | 40 | |
| 8 –6 –52 | 60 | 60 | |
| Total | 223 | 165 | 58 |

14. Redmond was aware, furthermore, that there had been trouble with NOP's testing equipment which caused some delay in accepting delivered motors (Tr. 252) and that motors were being tested until the end of July, 1952 (Tr. 246–48).

15. Russell was ultimately paid for all 32 (Ex. 1, ¶22; Tr. 115).

16. Redmond's mention of 182 motors in its August 13 letter (Ex. 58) is, using any combination of deliveries, unsupported in the record.

17. See p. 16, infra. By August 13, 1952, three of the Redmond invoices bearing Russell's assignment had been returned for rebilling (by letters dated July 14 and 21, 1952) and two were returned thereafter (by letter dated August 26, 1952) (Tr. 76–78; Exs. 45–47).

Payment to Russell for accepted motors was made as follows (Ex. 1, ¶22):

| Date Motors Received | Amount | Date Check Issued |
|---|---|---|
| 11–19–51 | 5 | 4–17–52 |
| 3–31–52 | 8 | 4–17–52 |
| 5– 1–52 | 11 | 8–11–52 |
| 5– 9–52 | 2 | 8–11–52 |
| 5–19–52 | 6 | 8–11–52 |
| 7– 2–52 | 13 | 9–19–52 |
| 7–11–52 | 20 | 9–19–52 |
| 7–21–52 | 40 | 9–19–52 |
| 8– 6–52 | 60 | 9–19–52 |

The submission of invoices for delivered motors can be divided into three groupings: first, those for motors delivered from October 16, 1951 to February 1, 1952; second, those for motors delivered from March 31, 1952 to May 19, 1952; and finally, those for motors delivered from June 16, 1952 to August 6, 1952.

A Redmond invoice was submitted for the 5 motors delivered on November 19, 1951 and ultimately accepted by the Navy (Tr. 59–60). Since Redmond informed NOP it had agreed to act as subcontractor to Russell and billing was to be on Russell invoices, this invoice was returned on March 5, 1952 for rebilling (Exs. 25, 27; Tr. 60–61). A Russell invoice was then submitted for those motors and payment was made to Russell (Ex. 28, Tr. 61–62). The record does not disclose whether invoices were submitted for the sets of 5 motors (ultimately rejected) which were delivered on October 16, 1951 and February 1, 1952.

With regard to motors received from March 31, 1952 to May 19, 1952, Russell invoices were submitted and payment was made to Russell for the motors accepted (Exs. 29–38; Tr. 65). Payment was not made for motors delivered in May, 1952 until August 11, 1952 because tests on these motors by NOP were incomplete until July 28, 1952 (Tr. 72–73; 246–77). Redmond, however, was aware that tests on these motors were being performed during this period (427–28).

As to motors received from June 16, 1952, to August 6, 1952, a Redmond invoice was submitted bearing the legend (Exs. 40–44; Tr. 74–75):

"This invoice has been assigned, transferred and sold to Redmond Company, Inc., and must be paid to Redmond Company, Inc."

Russell Electric Company
by W. Walter Young
Comptroller

The minutes of the meetings of Russell's Board of Directors in April, 1952, reflect that Contract 947 was purportedly assigned to Redmond, "subject to the obligations of such contract." [18]

18. At a special meeting of the Russell board of directors held on April 24, 1952, it was (Ex. 52B):
RESOLVED that this corporation does hereby assign all its right, title and interest in and to contract [947] * * *, subject to the obligations of such contract, to Redmond * * *.

A further resolution authorized Russell officers to take all action appropriate to effectuate the assignment. At a similar meeting on June 9, 1952, the board ratified assignments of Accounts Receivable to Redmond in consideration for which Redmond agreed to pay commissions of all sales made pursuant to the assigned contracts at a rate of 3.2% (Ex. 52C).

Apparently, the assigned invoices were executed by Russell pursuant to its board's resolutions (see Exs. 52B, 52C). Since these invoices were improper under Contract 947 (Tr. 78–79) and not in accordance with Redmond's letter of February 13, 1952 (Ex. 25), they were properly returned for rebilling (Exs. 45–7; Tr. 76–77).[19] Russell was ultimately paid on September 19, 1952.[20]

## LAW

### Contentions

As we see it, the Government contends[21] that Russell breached Contract 947 by failing to deliver gyro motors as provided in the contract; NOP had no duty to authorize payment to Redmond for accepted motors on the basis of invoices assigned to it by Russell and Russell cannot assert NOP's failure to authorize payment thereupon as a basis to avoid liability under Contract 947; and, in any event, NOP did not hinder Russell's performance.

Moreover, a duty to mitigate damages does not exist where there is a reasonable expectation of a defaulting party curing his breach of contract by performance and not until September, 1952, did the Government have good cause no longer to entertain such a reasonable expectation; the termination and reletting of Contract 947 were justified and took place without unreasonable delay. Russell therefore is liable to the United States for the excess costs incurred in reletting the contract.

Russell argues that it performed none of its contractual obligations and totally repudiated Contract 947 in August and September, 1951; NOP then had the right to terminate Contract 947 for default and had the duty to mitigate damages; Redmond, at that time and continuing to August, 1952, was a competent source of supply for gyro motors, approved by and satisfactory to NOP; Redmond was ready, willing and able throughout to deliver gyro motors called for under Contract 947 pursuant to the price and manufacturing terms thereof; therefore, NOP's failure, after Russell's repudiation, to promptly terminate and relet Contract 947 constitutes a failure of NOP's duty to mitigate damages and is a bar to its recovery herein.

In any event, Russell insists that after November 1, 1951, it was no longer an eligible supplier of gyro motors to NOP; it did not authorize NOP to designate, or Redmond to act as, its subcontractor; rather, Russell in fact assigned Contract 947 to Redmond and NOP's conduct and dealings with Redmond constitute consent to the assignment; as such assignee, Redmond was entitled to be paid directly for all motors delivered to and accepted by NOP; NOP's total indifference to the consequences of its refusal to authorize payment to Redmond, and its insistence upon payment to Russell against Russell invoices, furnishes a complete bar to recovery herein.

Russell also disputes the measure of damages advanced by the Government and certain elements of their computation.[22]

In considering these contentions, the Court notes its jurisdiction over the subject matter and parties to the action and that their rights, duties and liabilities are to be determined under federal law.[23]

---

19. The record does not disclose that the purported assignment of Contract 947 or the resolutions of Russell's board of directors were made known to NOP except by the submission of the improper invoices (Cf. Ex. 45).

20. See Ex. 1, ¶22; Exs. 48–51; Tr. 79–81.

21. Contentions as to damages are set forth infra, p. 24.

22. See p. 24, infra.

23. 28 U.S.C. § 1345. As to the applicability of federal law, see Priebe & Sons, Inc. v. United States, 1947, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32; United States v. Allegheny County, 1944, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209; Clearfield Trust Co. v. United States, 1943, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; United States v. Sabin Metal Corp., S.D.N.Y., 1958, 151 F.Supp. 683.

18

*Default and Termination*

■ In seeking money damages for breach of contract, the Government occupies no special position before the bar of justice. It stands as would any other plaintiff.[24]

While we find entirely reasonable and proper NOP's termination of Contract 947 in September of 1952, we reject the implication that Russell's default rested on its failure to meet the specific delivery schedule specified in the contract. Equally so, we find no basis to support Russell's "concession" that it totally repudiated and abandoned the contract by September of 1951.

Despite the felt need for gyro motors in the fall of 1951 to aid our military effort in the Korean police action (Tr. 240), NOP's correspondence with Russell demonstrates that the installment delivery schedule was not the essence of Contract 947 (Ex. 11; cf. Ex. 2 p. 8). NOP twice gave Russell opportunity to cure default in deliveries (Exs. 11, 61) and after the contract deadline, accepted deliveries for which payment was made to Russell. Moreover, by its letter of January 10, 1952 (Ex. 23), NOP gave approval to Redmond's request that it be allowed to establish itself as subcontractor to Russell (an arrangement approved by Mr. Frost).[25]

■ These actions constitute a waiver by NOP of its contractual right to the completion of delivery by January 31, 1952 (Ex. 2). See 6 Williston on Contracts, Third Edition § 856; Appeal of

Park Tissue Mills, Inc., ASBCA 7569, 63 BCA 374 (1963); Appeal of Keogh, ASBCA 5664, 61–1 BCA 3024 (1961); Appeal of Hamelco, Inc., 6 CCF ¶ 62,250, ASBCA 3253, 57–1 BCA 1251 (1957) (waiver of testing requirement; government approval of subcontracting entire contract).

■ ■ Such a waiver, however, did not leave Russell with a prerogative to perform or secure performance at a time convenient to itself. NOP could expect, as is implied in every contract absent binding expression to the contrary, that promised performance would be forthcoming within a period of time reasonable under all the circumstances. See Appeal of Goodrich, ASBCA 2760, 58–1 BCA 1624 (1958); see also Zoda v. United States, 1960, 180 F.Supp. 419, 148 Ct.Cl. 49.

Deliveries under Contract 947 began in October, 1951, before the date (November 1) Russell had said operations in its Chicago plant would cease. Manufacture of the gyro motors, a new piece of electrical equipment, raised many engineering problems which plagued volume production well into May, 1952 (Cf. Ex. 13 indicating as of late September, 1951, that by the end of November it was expected that motors could be produced at the rate of 150 per day). The parties have agreed that these problems do not affect Russell's liability under the contract (Tr. 267). They do indicate, however, why deliveries of acceptable gyro motors could not be completed by the contract deadline.

24. See Perry v. United States, 1934, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912; Lynch v. United States, 1933, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434; The Century Indemnity Co. v. United States, 1956, 99 U.S.App.D.C. 19, 236 F.2d 752.

25. When Mr. Frost was asked if he was aware that Redmond had written NOP on January 13, 1952, saying it was acting as subcontractor for Russell, he testified: "I didn't know it then, but I wouldn't be surprised *because that was our arrangement.*" (Tr. 312; emphasis added). Further, when asked if he was clear that the contract was between the Government and

Russell, and Redmond was acting as a subcontractor, he testified "There is no question about that." (Tr. 313; cf. Tr. 317). It is unclear from the record the precise letter about which Mr. Frost was questioned. Redmond wrote NOP on *January 3*, 1952 (Ex. 22) seeking approval of the subcontracting arrangement; and again on *February 13*, 1952 (Ex. 25) confirming NOP'S letter to it dated *January 10*, 1952 (Ex. 23). There is no letter in the record from Redmond to NOP dated *January 13*, 1952. This does not vitiate Mr. Frost's testimony as to his understanding of any arrangement with Redmond.

After NOP's receipt of a copy of Redmond's "no further performance" letter to Russell (Ex. 58, dated August 13, 1952), NOP wrote Russell on August 22, 1952, seeking not only a cure of default in deliveries, but also "acceptable evidence that performance will not be delayed * * *." (Ex. 61). As NOP therein indicated, Contract 947 permitted default termination where " * * * the Contractor * * * so fails to make progress as to endanger performance of [the] contract in accordance with its terms" if default is not cured within ten days of notice by NOP (Ex. 2, Section 11(a) (ii) of General Provisions, pp. 13–14).

■ Faced with Russell's prospective inability to cure default or secure performance, and without a response from Russell of any kind (much less the requested assurance), NOP was justified in terminating the contract for default on September 11, 1952 (Ex. 62; Exs. 47, 57–58, 61; Tr. 150).

Russell does not dispute its breach of Contract 947, but would have us conclude that by September, 1952 NOP had in fact and law consented to an assignment of Contract 947 to Redmond and thus the termination letter to Russell dated September 11, 1952 (Ex. 62) was without legal effect. We cannot agree.

■ Section 15, Title 41 of the United States Code provides in part:

No contract or order, or any interest therein, shall be transferred by the party to whom such contract or order is given to any other party, and any such transfer shall cause the annulment of the contract or order transferred, so far as the United States are concerned. All rights of action, however, for any breach of such contract by the contracting parties, are reserved to the United States.

⁎ ⁎ ⁎ ⁎ ⁎ ⁎

Despite the bar of this provision, the Government may, if it chooses to do so, recognize the assignment of a contract between itself and another. Maffia v. United States, 1958, 163 F.Supp. 859, 143 Ct.Cl. 198; see Benjamin v. United States Union Minerals & Alloys Corp., 1963, 318 F.2d 728, 160 Ct.Cl. 337. Had Russell communicated to NOP its purported assignment of the contract to Redmond in April of 1952 (Ex. 52), the Government would have had the opportunity, in light of its understanding at that time that Redmond was Russell's subcontractor, to accept or reject the assignment. Russell did not do so; nor does it appear that Redmond revealed to NOP the events of the April or June special meetings of Russell's board of directors.

Russell does not rely solely upon its formal assignment (Ex. 52). It also claims that its dealings with Redmond constitute what, in fact and law, is implied consent to the assignment.

We are cited to G. L. Christian and Associates v. United States, 1963, 312 F.2d 418, 422, 160 Ct.Cl. 1, petition for rehearing denied, 320 F.2d 345, 160 Ct. Cl. 58, cert. denied, 1963, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314, petition for rehearing denied, 1964, 376 U.S. 929, 84 S.Ct. 657, 11 L.Ed.2d 627, motion for leave to file second petition for rehearing denied, June 22, 1964, 377 U.S. 1010, 84 S.Ct. 1906, 12 L.Ed.2d 1059. We think the Christian case inapposite.

The Christian case involved an action against the Government for money damages arising from its termination of a contract for a federal housing project at a federal fort. It was brought in the name of the nominal prime contractor by a subcontractor and certain of the subcontractor's suppliers because, not having privity with the government, they could not sue in their own names. See Severin v. United States, 1943, 99 Ct.Cl. 435, cert. denied, 1944, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567. The Court of Claims concluded that, "for the purposes of the 'Severin doctrine', the only fair position in this court is to treat the [subcontractor] as the prime contractor, to which the housing contract has been assigned with the [Government's] full consent, and to disregard

the nominal plaintiff as if it were no longer involved." 312 F.2d at 422.

The Court of Claims also questioned whether the Anti-Assignment Act (41 U.S.C. § 15) "*absolutely precludes* us from recognizing [the subcontractor] as the true party in interest" (emp. added). It concluded it did not, and in view of the Government's recognition of and assent to the subcontractor's "full participation" as "prime contractor" it would "be unreasonable * * * to hold otherwise at this late stage." 312 F.2d 422-423.

In the instant case, however, it is the Government that brings suit and its claims are against Russell, the prime contractor. Moreover, absent here is the fact, found as such in Christian, that the Government told the prime contractor early in their dealings that under the relevant law (there, the Capehart Act), the contract (for housing) could not be assigned. Here, NOP was not directly asked to approve an assignment, as such. It was asked to transfer or reissue the contract; or to cancel purchase orders placed on Russell and re-place them with Redmond. In view of those requests, NOP undertook to cooperate in securing a novation. Indeed, from September, 1951 to July 1952, it remained ready to process the necessary information sought by BSA, but neither Russell nor Redmond would provide it.

Moreover, Russell stood silent with full knowledge of the correspondence between NOP and Redmond with regard to Redmond's request for approval that it establish itself as subcontractor, an arrangement clearly understood by Mr. Frost. Although the details of such an arrangement between Redmond and Russell were not placed in evidence, we regard them as immaterial in evaluating NOP's acquiescence in the proposal. NOP's concern was not with those details, but with what a subcontracting arrangement purported to assure: Russell's continued performance. See Bullock v. United States, E.D.Wash., 1964, 247 F.Supp. 320.

Finally, Russell itself, in resolving to assign Contract 947 to Redmond in April, 1952, did so subject to the obligations of the contract (Ex. 52B); and, as reflected by the minutes of the special board of director's meeting in June, 1952, Russell retained (albeit indirectly) a 3.2% interest in the contract proceeds (Ex. 52C).

Accordingly, in light of the surrounding correspondence, the beginning of deliveries under Contract 947 in October, 1951 and the failure of both Russell and Redmond (despite NOP's efforts) to provide information had by them and regarded as a necessary prelude to novation discussions by BSA, it would be contrary to fact and unwarranted by law to imply consent to an assignment from NOP's acceptance of delivered motors or approval, in January, 1952, of Redmond's written proposal that it establish itself as Russell's subcontractor.

*The Duty to Mitigate Damages*

Russell's claim that NOP had a duty to mitigate damages by re-letting the contract in the fall of 1951 is without foundation in fact or law.

A duty to mitigate damages arises when (1) a contract is breached and (2) it appears that the breaching party has abandoned or repudiated his obligations under the contract. If negotiations between the parties are pending, if assurances are made that performance will be forthcoming, or if other circumstances indicate that the breaching party intends to perform, then, even though the contract has been breached, no duty to mitigate arises. Watts v. Camors, 115 U.S. 353, 6 S.Ct. 91, 29 L.Ed. 406 (1885); American Surety Co. of N. Y. v. Franciscus, 8 Cir., 1942, 127 F.2d 810; J. L. Metz Furniture Co., Inc. v. Thane Lumber Co., 8 Cir., 1924, 298 F. 91; Kentucky Distilleries & Warehouse Co. v. Lillard, 6 Cir., 1908, 160 F. 34; 5 Corbin, Contracts § 1039 (1960).

The burden of proof on the issue of failure to mitigate damages is on the party asserting such failure. Hoff-

man v. United States, 1960, 10 Cir., 276 F.2d 199; United States v. Warsaw Elevator Co., 2 Cir., 1954, 213 F.2d 517; In re Kellett Aircraft Corp., 3 Cir., 1950, 186 F.2d 197; American Surety Co. of N. Y. v. Franciscus, supra; Kentucky Distilleries & Warehouse Co. v. Lillard, supra; 5 Corbin, Contracts, § 1039 (1960).

In claiming that NOP failed to mitigate damages, we do not understand Russell to say that its failure to assure performance was excusable or that the price and terms of the re-let contract were unreasonable.[26] Its claim, simply put, is that there was an unreasonable delay in terminating Contract 947 and had it been promptly terminated, it could have been relet at the prevailing contract price. Such a delay would, under those circumstances, bar the Government from recovering the full excess costs here sought. See Rose v. United States, 1954, 124 F.Supp. 419, 129 Ct.Cl. 715.

Russell points to a number of legal doctrines which, it argues, makes the delay in termination unreasonable.

 First, it claims that it had abandoned and repudiated Contract 947 by September of 1951, and NOP was aware of that fact. We cannot agree, not only because NOP was not so aware,[27] but also because Russell's own conduct is inconsistent with its assertion.

Russell's concern with performing its obligations under Contract 947 was such that Mr. Frost made arrangements with Redmond to insure it would not default. The June and July, 1951 correspondence to NOP assures performance from consolidated facilities at Redmond's plant. Russell invoices certified by Russell were submitted for motors delivered under Contract 947, beginning with October, 1951 and continuing through August, 1952. Russell received payment from the Government for accepted motors. Russell's own board of directors, meeting in April, 1952, acknowledged a present obligation under the contract (Ex. 52).

In light of all the circumstances, it cannot be said that Russell effectively communicated to NOP an intent during the fall of 1951 to repudiate the entire contract or that Russell's actions and dealings with NOP and Redmond thereafter were other than "on the assumption of an existing and continuing contract." See McNamara v. Cerf, 2 Cir., 1924, 4 F.2d 997, 999.

 The second point Russell advances is that the Government had the duty to terminate Contract 947 when NOP became aware, four months after the contract was entered, that Russell would no longer maintain a manufacturing facility, thus rendering it ineligible under 41 U.S.C. § 35(a) as a government supplier. This we reject.

Russell concededly was an eligible supplier at the time the contract was entered (Tr. p. 273). Whatever effect its failure to maintain a manufacturing facility might have had if new contracts

26. Russell interposes no claim that NOP should have accepted a bidder other than Redmond in reletting the contract (Tr. 239–42; 243–44; 300–02; see Tr. 135; Ex. 2, Article 11(c)). Indeed, the Contracting Officer had a broad discretion to repurchase as he deemed appropriate (Ex. 2, Article 11(c)). See United States v. Warsaw Elevator Co., supra, 213 F.2d at 518; United States v. Elliott Truck Parts, E.D.Mich., 1957, 149 F.Supp. 52, aff'd 6 Cir. 1958, 261 F.2d 835; Tampa Electric Co. v. Nashville Coal Co., M.D. Tenn.1963, 214 F.Supp. 647; United States v. Hawthorne Manufacturing Co., W.D.Mo., 1962, 211 F.Supp. 222, aff'd sub nom. American Surety Co. of New York v. United States, 6 Cir. 1963, 317 F.2d 652.

27. While NOP may have been justified had it terminated the contract in 1951 (Russell having defaulted on the first delivery and failing to directly answer the September, 1951 "warning letter"), it was not required by law to do so, and its failure to do so was not, under all the circumstances, unreasonable. See Norrington v. Wright, 1885, 115 U.S. 188, 203, 6 S.Ct. 12, 29 L.Ed. 366; Appeal of Crown Lee Corp., 1962, ASBCA 7644, 62 BCA 3540. Where a choice has been required between two reasonable courses, the defaulter who forces the choice cannot complain that one rather than the other was pursued.

with the Government were sought, nothing in Section 35(a) invalidated the gyro contract or required NOP in the fall of 1951 to issue a termination letter.[28]

■ The purpose of Section 35(a), enacted for the benefit of the Government, is spent when the contract is awarded. See Perkins v. Lukens Steel Co., 1940, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108; Perkins v. Endicott Johnson Corp., S.D.N.Y., 1941, 40 F.Supp. 254, rev'd on other grounds, 2 Cir., 128 F.2d 208, aff'd, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424. Russell cannot assert a purported disregard of its requirements (here arising from circumstances it created after the contract's award) as a basis for avoiding liability under, or imposing on NOP a duty to terminate, Contract 947. See United States v. Warsaw Elevator Co., 2 Cir., 1954, 213 F.2d 517. This would be so even if the precise status of Russell had been effectively communicated to NOP.

■ The third claim by Russell is that NOP failed to mitigate damages by not paying Redmond directly for motors delivered under Contract 947. We find this unacceptable.

NOP's position was, as Mr. Wilgus testified, that Russell was the prime contractor (Tr. 369). When it appeared that efforts to effect a novation would be frustrated because neither Redmond nor Russell would supply the necessary information, NOP approved the subcontracting proposal. In doing so, however, it made clear (Ex. 23, dated January 10, 1952) that payment would be made only to Russell against Russell invoices. Redmond consented to act as subcontractor under those terms (Ex. 25, dated February 13, 1952).

Beginning with the shipment of motors on June 15, 1952, however, Redmond submitted invoices on Redmond letterheads bearing an assignment of the invoice from Russell (Tr. 74–75; Exs. 40–44; Ex. 26: Redmond packing slips #50529, 50557, 50570, 50586, 50607, 50628). These were returned for rebilling (Tr. 76–77; Exs. 45–47) as had been the Redmond invoice originally submitted for the motors delivered on November 19, 1951 (Tr. 59–61; Exs. 25, 27).

In explanation of Redmond's failure to conform to its own understanding, as evidenced by its letter to NOP of February, 1952 (Ex. 25), Mr. Wilgus testified that (Tr. 367–69)

we were afraid we would be unable to receive funds through Russell Company because of contingent liabilities and we would not continue to invoice or do business through Russell to the Navy.

However realistic might have been Redmond's apprehension with regard to Russell, NOP was under no duty to recognize the assigned invoices or consent to an assignment of the contract.

■ The Assignment of Claims Act of 1940, as it applies to contracts with the United States, provides that the proceeds of such contracts may be assigned only to a bank, trust company or other financing institution. 41 U.S.C. § 15; United States v. Hadden, 6 Cir., 1951, 192 F.2d 327.

■ The contract with Russell (947) set forth this restriction (Ex. 2, Article 8). As between NOP and Russell, the purported assignments of invoices by Russell to Redmond were of no binding effect and in no way obligated NOP to honor them; much less to do so contrary to the terms upon which it accepted Red-

---

28. Section 35(a) of Title 41, United States Code provides in part
 In any contract made and entered into by any executive department, independent establishment, or other agency or instrumentality of the United States * * * for the manufacturing or furnishing of materials, supplies, articles, and equipment in any amount exceeding $10,000, there shall be included the following representations and stipulations:
 (a) That the contractor is the manufacturer of or a regular dealer in the materials, supplies, articles, or equipment to be manufactured or used in the performance of the contract;
 *　　*　　*　　*　　*

mond as a subcontractor to Russell. Fine Fashions, Inc. v. United States, 2 Cir., 1964, 328 F.2d 419; United States v. Hadden, supra.

■ Russell's argument goes even further. Under its view, even if the assignments were without effect, NOP's refusal to pay Redmond directly resulted in Redmond's refusal to continue manufacturing the motors for Russell. Such hindrance by NOP is a bar to its recovery here.

Surely, that viewpoint cannot be sustained. Analytically, its thrust is not that after a breach of contract, NOP failed to mitigate damages, but rather that NOP is legally responsible for the breach which resulted in termination of the contract.

NOP, however, did not, by affirmative conduct, make performance by Russell or continued manufacturing by Redmond, impossible or substantially more difficult. See Corbin, Contracts §§ 947, 1264 (1960). *NOP merely stood on its contractual rights.* No basis is thus created for holding that NOP hindered or prevented performance by Russell. United States v. Fidelity & Deposit Co. of Maryland, 2 Cir., 1957, 152 F. 596; see United States v. Peck, 1880, 102 U.S. 64, 26 L.Ed. 46; 6 Corbin, Contracts § 1264 (1960).[29]

Moreover, NOP's refusal to pay Redmond directly is hardly a justification, under the facts here, for Russell's failure to perform.

Russell was prime contractor. The contract incorporated the Assignment of Claims Act of 1940 (41 U.S.C. § 15) which prohibited assignments like those of Russell invoices to Redmond. Russell approved of Redmond informing NOP that it was establishing itself as a subcontractor and Redmond agreed to the terms (e. g. billing by Russell) on which NOP would approve a subcontractual arrangement. While Redmond's letter to Russell of August 13, 1952 (Ex. 57) expressed concern that it would not be paid, NOP never refused to pay for accepted motors nor did either Redmond or Russell ever claim payments were overdue.[30]

■ Finally, we cannot accept Russell's fourth claim that the warning and termination letters issued by NOP on August 22 and September 11, 1952 respectively (Ex. 61, 62) must be regarded as nullities. Russell's Post-Trial Memorandum, 42–46, 75–76. Russell not only failed to assure attempts to perform or secure performance, but it failed to reply. Such failure to reply, despite NOP's knowledge that Russell had no manufacturing facility and had relied exclusively on Redmond, justified termination for default.

*Appeal of L. W. Foster Sportswear Co. Inc.* ASBCA Nos. 5754, 5771, 6500, 6501, 7045 and 7567, 62 BCA ¶ 3364 (1962) does not require a finding otherwise. In so holding, we do not dispute Russell's claims that NOP could have terminated the contract in 1951 or BSA could have reissued it to Redmond, by novation or otherwise.[31] Assuming *arguendo* that the Government could have done either, the question still remains whether, in light of all the circumstances, NOP rea-

---

29. This is especially so in view of Redmond's knowledge that delay in acceptance of motors delivered was due to technical difficulties in the testing equipment and that not until mid-July were the problems fully eliminated. See p. 14, supra.

30. Redmond's letter to NOP (Ex. 58, dated August 13, 1952, stated: "while our temporary arrangement with Russell * * * has resulted in a loss to us, it did result in our producing the gyromotor * * *." Redmond's concerns were thus apparently more than a fear of the liabilities to which Russell might be subject. Whatever may have been the precise relationship between Russell and Redmond, with regard to Contract 947, NOP cannot be charged with a failure to mitigate damages because Russell might have lacked an enforceable subcontract with Redmond. Russell did not seek to substitute for Redmond's manufacture of the gyros, nor make clear its position after receipt of NOP's warning letter of September 11, 1952 (Ex. 62).

31. See Defendant's Post Trial Memorandum, p. 79.

sonably exercised its forbearance. We hold that it did. See 4 McBride and Wachtel, Government Contracts, §§ 31.-160, 31.170.

### The Measure of Damages

Even if NOP had unreasonably failed to terminate Contract 947 prior to September, 1952, the burden of establishing that it failed to mitigate damages and those sought here are thus improper rests upon the defendant.

Under Contract 947, it is provided that where the Government terminates for default,

the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and *the Contractor shall be liable to the Government for any excess costs* for such similar supplies or services,

\* \* \*

[Ex. 2, General Provision 11(c), emp. added]

Excess costs have been held to be the equivalent of actual damages. Schmoll v. United States, 1946, 63 F.Supp. 753, 105 Ct.Cl. 415; Fireman's Fund Indemnity Co. v. United States, 1945, 63 F.Supp. 750, 104 Ct.Cl. 648. Usually, actual damages are computed by taking the difference between the Government cost under a repurchase contract and what would have been its costs under the terminated contract. See 5 Wachtel and McBride, Government Contracts, §§ 30.10, 30.20, 33.60, 33.60 [2], 33.60 [3].

If the Government does not act with reasonable promptness in terminating a contract, or in reletting after termination, the damages to which it may be entitled are no more than those it would have incurred had it acted promptly. Rose v. United States, supra. This is so because the defaulting party should not be held accountable for damages sustained by the other party if they could have been avoided with reasonable effort and without undue risk or expense. See Warren v. Stoddart, 1882, 105 U.S. 224, 26 L.Ed. 1117; W. B. Moses & Sons v. Lockwood, 1924, 54 App. D.C. 115, 295 F. 936, 33 A.L.R. 1467; McQuagge v. United States, W.D.La., 1961, 197 F.Supp. 460. Such is not the case here.

Russell claims that Redmond, throughout, was willing to become prime contractor on Contract 947 (in its entirety) at the contract price of $14.12 (or $14.-11493) per unit and to thus measure damages for breach of contract based upon the relet price of $39.87 is unreasonable. We cannot agree.

First, we have already held that under the facts here, the Government had no duty to mitigate damages until September, 1952.

Second, the excess costs standard was incorporated in Contract 947.

Third, accepting these findings, Russell does not dispute the Government's exercise of discretion or the reasonableness thereof in accepting Redmond's bid on the replacement contract.[32]

Russell's final claim as to measuring damages is that NOP improperly

32. See p. 7 and note 26, supra. In view of this analysis, we make no finding on whether, as Russell contends, NOP could have relet Contract 947 to Redmond, during all material times prior to August, 1952, at the price of $14.12 ($14.11493) per unit. We note that tending to support Russell's assertion is the testimony of Mr. Frost (Tr. 97–98, 307–9); the testimony of Redmond officials (Mr. Wilgus: Tr. 315–18, 336–37; Mr. Tweedy, Tr. 328, 354–56) and Exhibits 10–14 and 22. We observe, however, that: (1) Redmond's original bid on Contract 947 was $17.25 (Ex. 4); (2) Redmond at no time stated specifically or unequivocally in writing that it would or did make a firm offer to assume Contract 947 "at the contract price"; (3) Redmond, "acting for Russell", rejected NOP's proposal, in the spring of 1952, to add 400 motors to Contract 947 at the contract price (Exs. 53–55, Tr. 105); (4) Indeed, NOP issued Contract 1982 for the 400 motors to Redmond on May 15, 1952 at $30.12 per unit (Ex. 56); (5) See note 30, supra.

allocated motors delivered under Contract 947 to Contract 1982 which it had with Redmond for the production of 400 gyro motors (Ex. 56). (See Exs. 26(b); 59; 71–3; Defendant's Supplemental Trial Memorandum, pp. 56–59). The total number of motors involved in this claim is 138.[33]

As to 137 of those motors, Russell's argument is moot. The Government claims as damages only the difference between the costs under the Russell contract (947) and those under the relet contract (2261). NOP admits that by administrative error the relet contract called for the purchase of only 6,768 motors, not the 6935 outstanding under Contract 947 on September 11, 1952, the termination date.[34]

The nature of the "administrative error" was left unexplained at trial, but an examination of the entire record leaves in no doubt its relation to the 138 motors of which Russell here complains.

There is no persuasive evidence, however, to regard the allocation of those motors to Contract 1982 as without business justification (see e. g. Exs. 58–59, Tr. 168) and thus deduct, from the claimed damages, an amount to cover the single unit as to which Russell's claim is not moot.[35]

### Conclusions

The motions made by plaintiff and defendant for a directed verdict at the close of trial are denied.

Defendant's motion for dismissal of the complaint based upon the entire record is denied.

Based upon a quantitative and qualitative review of the entire record and the reasonable and natural inferences to be drawn therefrom, plaintiff is, under the applicable law, entitled to judgment against defendant in the amount of $180,745.96.

The foregoing opinion shall constitute the Court's findings of fact and conclusions of law.

### ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

After trial, plaintiff was awarded damages against defendant for breach of a supply contract (hereinafter Contract 947). See opinion and findings filed July 22, 1965.

To determine plaintiff's demand in its complaint for damages "together with interest according to law, from November 18, 1952, together with costs and disbursements" of the action, a hearing was held September 21, 1965.[1]

Based upon that hearing and all proceedings theretofore had, the Court makes the following additional findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff made written demand from defendant of payment of contract damages in the amount of $180,745.96 on November 18, 1952.

2. It does not appear that any part of this demand was satisfied; nor that by appropriate proceeding defendant either deposited the demand amount in Court or placed it in escrow pending disposition of the claim.

3. This action was instituted by the filing of a complaint on July 6, 1959, almost seven (7) years after the original demand for payment.

---

33. Russell argues that NOP had not received Contract 1982 until August 15, 1952 (Tr. 164), but payment of 138 motors shipped and received before that date under Contract 947 was later made to Redmond under Contract 1982 (see Ex. B, in Ex. 26; see also, Defendant's Memorandum After Trial, p. A–17).

34. Contract 947 called for the production by Russell of 7,100 motors of which 165 were delivered and accepted. This leaves 6935.

35. It would appear, furthermore, that in light of the entire circumstances, this claim as to the single motor becomes de minimis non curat lex. See 44 A.L.R. 168 (1926).

1. The transcript of the hearing of September 21, 1965, filed herewith is made part of the record.

4. The amount demanded was, as of the time of demand, liquidated.

5. Neither a federal statute nor Contract 947 provides for an award of interest in this case. The claim is by way of compensatory damages.

6. Since November 18, 1952, the plaintiff has been deprived by defendant of the use of $180,745.96.

7. Reasonable compensation for such non-use is simple interest at the rate of 6% per annum.

8. The record does not disclose what factors delayed for close to seven (7) years the institution of this lawsuit on July 6, 1959.

9. The record does not disclose whether by refusing the demanded payment defendant thereafter enjoyed the use of such amount, on which it has been found liable to plaintiff, or that defendant earned interest thereon.

10. Plaintiff's costs, by stipulation of the parties, amount to $485.55. See Transcript of Hearing, September 21, 1965, p. 8.

## CONCLUSIONS OF LAW

A. An award of interest as damages in a suit by the United States of America for breach of a federal government procurement contract against the prime contractor is a matter of federal law. See Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); United States v. Seaboard Surety Co., 339 F.2d 1 (2d Cir. 1964).

B. Under the circumstances in this case, in order to be made whole, the plaintiff is entitled to interest as an element of damages. Royal Indemnity Co. v. United States, supra; Board of Commissioners of Jackson County, Kan. v. United States, 308 U.S. 343, 60 S.Ct. 285, 84 L.Ed. 313 (1939); 5 Corbin, Contracts §§ 1045–46, 1050 (1964); McCormick, Damages §§ 54–56 (1935).

C. An award of interest on the facts of this case is made as compensation to plaintiff for non-use of liquidated contract damages to which it has been found

entitled after trial, not as a penalty upon defendant for failure to comply with plaintiff's demand of November 18, 1952. See Rodgers v. United States, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947).

D. It is proper to consider delay in commencement of suit in determining interest as compensatory damages. See Rodgers v. United States, supra; Redfield v. Ystalyfera Iron Co., 110 U.S. 174, 176–177, 3 S.Ct. 570, 28 L.Ed. 109 (1884). Where just reason for delay in instituting suit does not affirmatively appear, and such suit is commenced nearly seven (7) years after the cause of action arose, interest on the principal amount of liability should not be awarded for the period prior to commencement of the suit, especially where it does not appear that defendant earned interest or gained pecuniary benefit by retention of the principal sum. United States v. Sanborn, 135 U.S. 271, 281, 10 S.Ct. 812, 34 L.Ed. 112 (1890).

However, just compensation in this case requires an award of interest on the principal sum from July 6, 1959, when the action was commenced, until the entry of judgment. See Redfield v. Bartels, 139 U.S. 694, 701–703, 11 S.Ct. 683, 35 L.Ed. 310 (1891); United States v. Sanborn, supra; see also, E. M. Fleischmann Lumber Corp. v. Resources Corp. International, 114 F.Supp. 843, 845 (D.Del., 1953).

E. The rate of interest which affords plaintiff just compensation is set at 6% per annum. See Royal Indemnity Co. v. United States, supra; United States v. Seaboard Surety Co., supra; Contract 947 (Ex. 2, Article 21(i)).

Defendant contends and the Court judicially notices that rates of interest on obligations of the United States of America during the period in question were less than 6% (see Schedules A and B appended to Defendant's Memorandum After Decision, dated September 14, 1965). The argument, however, which would lead the Court to set a lower rate of interest is unpersuasive where, as here, the liability is based on breach of

contract and the full economic ramifications of the breach, resulting in plaintiff's non-use of the principal sum, are incapable of precise determination. United States v. Allen Tool Corp., 112 F. Supp. 882 (N.D.N.Y.1951); Transcript of Hearing, September 21, 1965, pp. 14–35, 26, 33–14; Cf. cases cited in Defendant's Memorandum, supra, pp. 16–17.

## DISPOSITION

Plaintiff is awarded against defendant costs in the amount of $485.55.

Plaintiff is awarded against defendant as compensatory damages simple interest at the rate of 6% per annum on $180,745.96 from July 6, 1959 through and including November 15, 1965, the filing date of the additional findings herein and the order of judgment, the amount of interest to be promptly (within ten (10) days of filing hereof) computed and settled by the parties and deemed incorporated herein.

This shall be considered an order; settlement thereof is unnecessary.